56 Ill.2d 394 (1974)
308 N.E.2d 605
MINA LEE et al., Appellants,
v.
CENTRAL NATIONAL BANK & TRUST COMPANY OF ROCKFORD, ILLINOIS, Admr., et al., Appellees.
No. 45804.
Supreme Court of Illinois.
Opinion filed January 31, 1974.
Rehearing denied March 28, 1974.
*395 George F. Nichols, of Dixon, for appellants.
Anthony R. Fabiano and Sam J. Cannariato, both of Rockford, for appellees.
Luke R. Morin, of Dixon, guardian ad litem.
Reversed and remanded.
MR. JUSTICE SCHAEFER delivered the opinion of the court:
The Appellate Court for the Second District affirmed a judgment that had been reluctantly entered by the circuit court of Lee County, and granted a certificate of importance. (11 Ill. App.3d 60.) Both courts felt themselves compelled to reach the result that they did because of the decision of this court in McAnnulty v. McAnnulty (1887), 120 Ill. 26. We have re-examined that case, and we have concluded, for reasons which will be stated, that it is not controlling here.
In the present case, Bert O. Vogeler and his then wife, Olive P. Vogeler, executed wills in 1949, which, after specific bequests, left all property owned by each of them to the other, or, if one should die before the other or within one week of the death of the other, to the nieces and nephews of both, then living. Bert Vogeler died on November 28, 1952, survived by Olive, leaving an estate, which, for inheritance tax purposes, had a gross value of $135,065.66. On June 16, 1962, Olive Vogeler, then aged 72, married Orin W. Cox, a widower then aged 74. On *396 October 23, 1964, Olive Cox and Orin Cox signed the following "Agreement":
"THIS AGREEMENT, entered into on Oct. 23, 1964, between Orin W. Cox, party of the first part, and Olive P. Cox, his wife, second party, for the purpose of clarifying and establishing their respective property interests, WITNESSETH:
WHEREAS, each of said parties had in his or her own right certain real and personal property at the time of said marriage, and
WHEREAS, before their marriage with each other and in consideration thereof, each of the said parties agreed verbally with the other that none of their respective property rights should in any way become affected or changed in any way by reason of said marriage,
NOW, THEREFORE, in consideration of the foregoing premises, and of the mutual covenants herein contained, the party of the first part hereby waives, releases, foregoes, and disclaims all his rights in any and all property, both real, personal, and mixed, wheresoever situate, of which the party of the second part is or may become seized or possessed, and hereby expressly waives all right to inherit from the second party under the laws of any and all states of the United States, and hereby agrees that the party of the second part shall have the right to dispose of all of her property by will and in case the party of the second part fails to dispose of any of her property, of any kind, by will, then said property shall descend to her legal heirs, other than the party of the first part, and he shall not inherit anything from her.
IN WITNESS WHEREOF the parties have hereunto set their hands and seals the date first above written.
 /S/ Orin W. Cox (SEAL)
 /S/ Olive P. Cox (SEAL)"
On February 16, 1970, Olive Cox died, survived by Orin Cox. A petition to admit her 1949 will to probate was denied, and no appeal was taken. On April 30, 1970, a petition for letters of administration was filed, signed by Orin Cox, and letters of administration were issued to the Dixon National Bank, one of the defendants. On May 28, *397 1970, Orin Cox died. On July 20, 1970, this action was instituted.
The plaintiffs are the nephews and nieces of Olive Vogeler Cox and her first husband, Bert Vogeler. They sought a decree that the will executed by Mrs. Cox in 1949, taken together with evidence of an oral agreement between Mr. and Mrs. Cox prior to their marriage and the written agreement set out above, constituted an equitable assignment of all the assets of the estate of Mrs. Cox to the beneficiaries under her will. The defendants are the banks which are administrators of the estates of Mr. and Mrs. Cox, heirs at law of Mrs. Cox who are not legatees under her will, and four children of Mr. Cox by his former marriage.
The trial and appellate courts both held that the marriage of Olive Vogeler to Orin Cox revoked her earlier will, and that determination has not been attacked. After the marriage of Mr. and Mrs. Cox, the statute which provided that a marriage revoked a will was amended to provide: "No will or any part thereof shall be revoked by any change in the circumstances, condition or marital status of the testator * * *." (Ill. Rev. Stat. 1965, ch. 3, par. 46.) Concerning this statute the appellate court said:
"It is obvious that the Legislature intended to rectify inequitable situations such as the case before this court. The Legislature went on to provide that the new provision would be applicable to wills of decedents dying after December 31, 1965. The 1965 Act further provided in substance however, that a will revoked in any manner, in this case by the marriage prior to the effective date of the Act, would not be revived except by re-execution." 11 Ill. App.3d at 61-62.
In addition to the document which has been set out, other written and oral evidence was advanced to establish the existence of a prenuptial agreement between Orin and *398 Olive Cox. Mrs. Gertrude Seebach, a sister of Mr. Vogeler, testified that she was well acquainted with Mrs. Cox and had seen and corresponded with her frequently from the time she was married to Vogeler. The plaintiffs sought to introduce into evidence a letter written by Mrs. Cox to Mrs. Seebach, dated May 31, 1962. It was stipulated that the letter was written and signed by Mrs. Cox, but the trial court sustained the objection to its admissibility on the ground that it was hearsay. Setting aside the hearsay problem for the moment, the relevant portion of the lengthy letter stated:
"Do you have smelling salts handy? Have some news which may make you pass out. Last Fall an old friend called whom I have known for 54 years and whose family are all married and wife died last year. He left for New Mexico & California to spend the winter same day I started on my New England trip said if I wrote you, will you answer? So I said I would, so my first letter came to Boston before I left there. Letters were very interesting of his trip and stay in Roswell, N.M. where a son is Leu't Col. in Air Force then to Calif. where another son & daughter live. Matter of fact, I went with him a couple of times when I was 17 and he 19 but told him of a girl in neighborhood whom he should ask for a date which he did, later married her and they celebrated their 50th Anniversary 3 years ago. Well you know what. That old guy thinks we must spend balance of our life together, which I have promised to do as he is such a nice fellow, good Christian doesn't drink or smoke, a good Republican and a number of good qualities too numerous to mention. His home was in Rockford. So now I wonder if you might disapprove; which you no doubt do. I never intended marrying again due to a number of things, but you know he told me he wanted to go to a Lawyer and sign off any right to anything I would have as he didn't want any of my money. Just me. Ha! I told him I had plans made and didn't want to change, so he is most agreeable. Bet you think I am crazy, but really am still in right mind. You are the first ones I have told this to in relation so don't spread it around. Will write the Connermans soon and they too may not like it. No fool like an old fool. Eh? Well it does seem nice to be taken out to dinner occasionally and *399 seeing some of our old acquaintances who are left. Haven't set a date yet but may not be long as he thinks our time together may be short due to our ages. As I still have the old house that I bought a number of years ago guess we will live in it as he sold his home in Rockford after his wife died. I do not intend sending out any announcements but will write you if & when. In the meantime please tell me just how you feel about it."
Mrs. Hazel Hanes Williams, a cousin of Mrs. Cox, testified that Orin Cox had said, not long after his marriage to Olive, "I don't want any of the poor girl's money, I didn't marry her for her money and I don't want any of it, what she had was to go to her nephews and nieces, that is the way Bert left it and that was the way she told me she was leaving it." She further testified that he had repeated similar remarks in 1968.
Glenn Weatherbee, whose first wife, since deceased, was a niece of Mrs. Cox, testified that he had known Mr. and Mrs. Cox before their marriage, and that after their marriage he saw them quite often; that not long after their marriage, in the presence of other members of Mr. Weatherbee's family, Mr. Cox had said, "I want you to understand, I don't want any of Olive's money, I have got good kids they can take care of me"; that even after the death of his first wife, he had occasion to visit Mr. and Mrs. Cox and that on such occasions "Usually he [Mr. Cox] would speak with me alone or draw us aside and whisper confidentially as if he didn't want anybody else to hear, to reassure me of that." After the defendants' objections to this statement were overruled, George F. Nichols, attorney for plaintiffs, continued his examination of the witness:
"Q. What did he say, what did Orin Cox say?
A. He said, I want you to understand I don't want any of Olive's money, we made an agreement.
* * *
A. What is her's is her's and what is mine is mine. I have got seven good kids, they can all take care of me, except one, I don't know what happened to her, *400 they can all take care of me, I don't want any of her money.
Q. You said something about an agreement, what was that?
A. He said, we made an agreement, everything that is mine is mine, everything is her's is her's, we have settled that, so you don't have to worry about that, I won't take any of her money.
Mr. Cannariato, attorney for defendants: We object to that and move to strike the answer it purports to change orally the terms of a written agreement and violates the parol evidence rule.
The Court: I will sustain the objection as to what he testified with reference to the agreement."
The evidence that there was an oral antenuptial agreement to the effect that neither Orin nor Olive Cox would claim any interest in the property of the other thus consists of the letter written by Mrs. Cox to Mrs. Seebach approximately two weeks before her marriage to Cox, the testimony of Mrs. Williams and Weatherbee as to conversations with Cox after that marriage, and the recitals of the post-nuptial agreement itself.
The letter was an out-of-court statement offered to prove the truth of matters asserted in it. It was hearsay, but we think it was admissible to prove the existence and terms of the oral agreement under that kindred group of exceptions to the hearsay rule which permit hearsay evidence of intent, motive, design or plan. (See generally 6 Wigmore, Evidence (3d ed. 1940), secs. 1725-27, 1729; McCormick on Evidence (2d ed. 1972), sec. 295; Proposed Federal Rules of Evidence, Rule 803(3); 56 F.R.D. 183, 300 (1973); Cleary, Handbook of Illinois Evidence (2d ed. 1963), sec. 17.27.) There are no clear demarcations among the categories. The existence of the mutual understanding or agreement could be regarded as an integral part of the parties' decision to marry, or as bearing upon their motive for entering into the marriage relationship. Under Mutual Life Insurance Co. v. Hillmon (1892), 145 U.S. 285, 295-96, 36 L.Ed. 706, the letter was admissible to show *401 that shortly before the time when other evidence tended to show that they entered into such an agreement, she intended to enter into such an agreement with Cox, and to marry him, which made it more probable that there was such an agreement than if there had been no proof of that intention. There are no Illinois decisions directly in point, but cases like Riggs v. Powell (1892), 142 Ill. 453, in which evidence of the intestate's statements of intention to provide for his widow were admitted to show that he had probably intended to and did assign a certain note to her as a gift, suggest a similar result.
The statements of Orin Cox which were testified to by Weatherbee and Mrs. Seebach were admissions against his interest, which were admissible against those claiming under him.
The most persuasive evidence of the existence of an antenuptial agreement between Mr. and Mrs. Cox is, of course, the executed document which has been set forth. It plainly states that: "* * * before their marriage with each other and in consideration thereof, each of the said parties agreed verbally with the other that none of their respective property rights should in any way become affected or changed in any way by reason of said marriage * * *."
The principles applicable to antenuptial agreements have frequently been stated: "Ante-nuptial agreements are not against public policy but, on the contrary, if freely and intelligently made, are regarded as generally conducive to marital tranquility and the avoidance of disputes concerning property. [Citations.] Marriage constitutes the consideration for the agreement and has been declared to be not only a sufficient consideration but also one of `the highest value.' [Citations.] It may be the only consideration where the prospective husband, by an ante-nuptial agreement, releases the interest which he otherwise would obtain in his future wife's property as a result of the marital status. [Citation.] The validity of such an agreement is not impaired because the intended wife fails or omits to waive *402 the interest she would acquire in her prospective husband's property since it is not essential that the agreement contain reciprocal provisions. Morris v. Masters, 349 Ill. 455." Seuss v. Schukat (1934), 358 Ill. 27, 34.
In the present case no written contract existed prior to the marriage, and the agreement was not executed until a considerable time after the marriage. It is at this point that McAnnulty v. McAnnulty (1887), 120 Ill. 26, comes into play. There are several differences between that case and this one. In its opinion in that case the court appears to have been primarily concerned with the extent to which Mr. McAnnulty's will had been revoked by his marriage, apparently an unsettled question at that time. The court held that under the statute the marriage had effected a total revocation. The right of his widow to inherit from him was also challenged upon the ground that it was barred by a written agreement which purported to bear her signature. From the court's opinion it is clear that the judges were satisfied that the purported agreement had never been executed by Mrs. McAnnulty, who was unable to write. Moreover, it appears from the record that there was a discrepancy between the terms of the agreement as they appear in the written document, the testimony of the lawyer who drafted it, and the testimony of Mrs. McAnnulty. We have examined the agreement in that case. It bears no date, and while it recites that "the said parties have agreed this day to join themselves together in matrimony," it was undisputed that the document had not even been prepared until some time after the marriage had taken place.
While the court had pointed out that "* * * in our judgment, the decided weight of evidence shows that she could neither read nor write, and consequently could have no handwriting," it also stated:
"As this instrument was not executed until about a month after the marriage, it is clear that if any agreement existed before or at the time of the *403 marriage, it was a mere verbal agreement, and, as such, it is obnoxious to the Statute of Frauds. The first section of chapter 59 of the Revised Statutes, among other things, declares, `that no action shall be brought whereby to charge * * * any person upon any agreement made upon consideration of marriage.' This alleged ante-nuptial agreement clearly comes within the provision of this section, and the statute must be given effect unless something has occurred to take the case out of its operation. The signing of the written instrument after the marriage, can be regarded, at the very farthest, as nothing more than a mere acknowledgment, in writing, of the terms of the previous verbal agreement, and this certainly does not meet the requirements of the statute, for the simple reason the statute requires the contract itself to be in writing." 120 Ill. at 34.
Section 1 of the Statute of Frauds read then as it reads now: "That no action shall be brought, whereby * * * to charge any person upon any agreement made upon consideration of marriage, * * * unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith * * *." (Ill. Rev. Stat. 1971, ch. 59, par. 1.) In its opinion in the McAnnulty case the court did not consider the possibility that the document involved in that case might have been regarded as a memorandum or note of an oral ante-nuptial agreement. We are unable to determine whether that was because the court was satisfied that the widow had not signed the document, or because the document itself made no reference to an earlier agreement. Neither of those considerations is present in the case before us. Here the agreement specifically refers to the fact that each of the parties had entered into an oral agreement "before their marriage with each other and in consideration thereof." *404 And the fact that Orin W. Cox signed the document is undisputed.
We are of the opinion that the McAnnulty case does not control the disposition of the present case, and that the written document was a sufficient memorandum to remove the oral antenuptial agreement from the bar of the Statute of Frauds. The judgment of the appellate court must therefore be reversed, and the cause remanded to the circuit court of Lee County for further proceedings.
Reversed and remanded.