*In re* MARRIAGE OF MARIA SOKOLOWSKI, Petitioner-Appellant, and RICHARD SOKOLOWSKI, Respondent-Appellee.

First District (2nd Division)   No. 1—90—2650

Opinion filed July 14, 1992.

Maria Pappas, Peter N. Kamberos, and Christopher Buchar, all of Chicago, for appellant.

Maloney & Craven, P.C., of Des Plaines (E. William Maloney, Jr., of counsel), for appellee.

JUSTICE McCORMICK delivered the opinion of the court:

Petitioner, Maria Sokolowski (Maria), appeals from a judgment of dissolution entered by the circuit court. Maria argues that the trial court abused its discretion in upholding an agreement she drafted and signed prior to her marriage to Richard Sokolowski (Richard). Maria also contends that the trial court erred in determining the parties' interests in the marital home and in finding that nonmarital assets owned by Richard were not transmuted into marital property.

## FACTS

Maria and Richard were married on January 30, 1985. On May 26, 1989, Maria filed for dissolution of the marriage, charging Richard with mental cruelty and requesting maintenance and a portion of the parties' marital property. While the hearing on the petition for dissolution was pending, Maria filed a motion *in limine* seeking to bar Richard from presenting evidence of an alleged prenuptial agreement signed by Maria. Maria argued that the agreement was invalid because (1) there was not full disclosure of Richard's assets; (2) Richard

did not sign the agreement; and (3) Maria was not represented by counsel at the time the agreement was signed.

A hearing was held on the petition for dissolution in August 1990. At the start of the hearing, the trial court stated that it would hear the evidence on Maria's motion *in limine* along with the evidence on the petition for dissolution and enter a ruling on the motion prior to rendering judgment.

It was established at the hearing that Maria was born in Poland in 1937. In May 1984, she came to America on a six-month visitor's visa to make funeral arrangements for her first husband.

Maria testified that in November 1984 she was introduced to Richard by Janina Dziengiel and that sometime in the second half of November, Richard proposed marriage. The parties were married on January 30, 1985. Maria stated that she was employed throughout the marriage and that all the money she earned was turned over to Richard.

In April 1985, the parties purchased a residence in Schiller Park, Illinois, for $70,000. At the time of the hearing, the house had a fair market value of $100,000.

Title to the property was taken in joint tenancy with right to survivorship. A $14,000 down payment was made on the home and Maria testified that she furnished the entire amount from the proceeds of her late husband's insurance. In March 1986, Maria's two children from her first marriage came to America and moved into the home with Richard and Maria.

According to Maria, everything in the marriage was fine until Richard received a telephone call from Janina Dziengiel shortly before Christmas 1988. Maria testified that after Dziengiel's telephone call, Richard held a gun to her head and threatened to kill her. Maria filed for divorce five months later.

When cross-examined about the prenuptial agreement, Maria acknowledged that she wrote out and signed the document, which was in Polish. However, Maria testified that she did not know what the document meant, that no one ever explained the document to her, that Richard did not request that she sign the document and that Richard did not disclose his assets to her prior to the marriage. Maria stated that after signing the document, she gave it to Janina Dziengiel and that she did not see it again until after the petition for dissolution was filed.

Maria testified that at the time of the trial, she did not have a savings account and her daughter, Margaret Slusarczyk, denied having a joint account with Maria. Margaret testified that she had her

own savings account, that the account had a balance of only $299 and that Maria had not contributed any amounts to the account.

On cross-examination, Margaret acknowledged that her 1988 and 1989 Federal tax returns showed that her gross earnings were $5,948 and $11,549, respectively, and that she reported $433 in interest income for 1989, after reporting only $63.79 in interest income in 1988. Later in the hearing, Richard introduced into evidence a bank signature card for a joint account in the names of Margaret and Maria.

Janina Dziengiel was called as a witness on Richard's behalf. Dziengiel, who was born in Poland and came to America in 1966, testified that she had known Richard for 20 years and that she met Maria in May 1984, when Maria came here to bury her husband. Dziengiel testified that she and Maria became close friends and that Maria often told her that she wanted to stay in America.

Dziengiel testified that during the summer of 1984, she had a conversation with Maria during which Maria stated that she wished to find someone to marry so that she could stay in this country. Dziengiel further testified that in December 1984, she arranged a meeting between Maria and Richard.

Dziengiel stated that after the second time Maria and Richard had seen each other, Maria told her that she was anxious to marry Richard but that she was afraid Richard would not marry her and that she would have to return to Poland. Dziengiel suggested that Richard might agree to marry Maria if Maria prepared some kind of agreement stating that she did not want to take Richard's property or money. Dziengiel testified that during this conversation, she told Maria that Richard probably was worth more than $100,000.

Dziengiel testified that at Maria's request, she prepared an example of a premarital agreement. The example was in English, and Dziengiel explained to Maria what it meant and told her to prepare and sign a similar agreement in Polish.

Dziengiel testified that shortly before the marriage, Richard showed her a Polish-language version of the agreement that had been handwritten, signed and notarized by Maria. In it, Maria stated that she waived "all [her] rights to [Richard's] property or his financial assets" and "all the rights as a wife and claims toward property."

Dziengiel testified that Richard did not know of her involvement in the preparation of the agreements, and that he did not tell or ask her to prepare them. Dziengiel also testified that at the time the agreements were prepared, Maria and Richard were not engaged to be married.

Richard, who was born in Poland and came to the United States in 1946, testified that he met Maria in December 1984 and that at their second meeting Maria told him that she was scheduled to fly back to Poland on December 19. Richard suggested that Maria cash in her ticket and remain here so that they would have a chance to get to know each other better. Richard testified that he told Maria that if things did not work out, he would buy her return ticket.

Richard testified that over the next month, he and Maria met two or three times a week but that the meetings never lasted more than an hour. It was at one of these meetings that Maria gave Richard the Polish and English versions of the premarital agreement.

Richard testified that he did not ask Dziengiel to prepare or obtain the document, nor did he ask Maria to prepare it. Richard further testified that prior to receiving the document, he never had any discussions with Maria regarding the execution or preparation of the document. However, Richard also testified that before Maria gave him the agreement, he was about to buy her return ticket to Poland and that he would not have married her if she had not given him the agreement.

According to Richard, he and Maria first discussed marriage around Christmas 1984, and that it was Maria who first brought up the subject. Richard testified that Maria told him that "the best way to get her over here would be marriage because everybody recognizes marriage, and everybody knows that if you marry American citizens you automatically stay in this country."

Richard also testified that seven weeks passed between his first meeting with Maria and their marriage and that the reason for the rush was the fact that Maria's son, Mark, was approaching the age where he would be drafted into the Polish army. Richard stated that if drafted, Mark would be required to serve for two years and, thereafter, he would be prohibited from leaving the country for another three years.

Richard testified that at the time of the marriage, he owned a piece of real estate in Florida; stocks valued at approximately $28,000; a certificate of deposit worth approximately $10,000; and a 1985 Buick, which he purchased by cashing in a second $10,000 certificate of deposit.

Richard testified that immediately after the marriage, papers were filed to secure permanent resident status for Maria and to get her children into the country. Richard stated that after the children arrived, his relationship with Maria deteriorated and she would no longer sleep with him. Richard also stated that there were several al-

tercations between him, Maria and the children in 1988 and 1989, but he denied ever holding a gun to Maria's head.

Concerning the home which the parties purchased in 1985 and for which Maria provided the $14,000 down payment, Richard testified that the principal mortgage had been reduced from $56,000 to $11,000. Portions of this amount came from Richard's lump sum payments of $10,000 in 1987; $14,000 in 1988; and $13,224 in 1989. The remainder of the reduction was through standard mortgage amortization. Richard testified that he obtained the funds to make these payments by liquidating nonmarital assets, including the Florida property and some of the stock he owned. Richard testified that at the time the final prepayment was made in March 1989, his relationship with Maria was nonexistent.

On cross-examination, Richard acknowledged that he was never asked to sign either of the agreements and that he never disclosed his assets and liabilities to Maria before the marriage. However, he claimed that he made an attempt to discuss his assets with Maria, but that she stated that she did not care.

On August 20, 1990, the trial court issued an "Outline of Opinion, Findings, and Order Following Trial on Hearing of Petition for Dissolution" (Outline). In the Outline, the trial court found that the agreement signed by Maria was valid and binding but of limited applicability. The court also found that it was "most improbable" that Maria did not have a bank account and that "based on the evidence" the account contained about $5,800.

On September 12, 1990, the trial court entered a judgment of dissolution incorporating the earlier Outline. In its judgment the court ordered that neither party be required to pay maintenance and that the marital residence be awarded to Richard subject to a lien in the amount of $12,000 in favor of Maria. The court awarded Maria sole and exclusive possession of her IRA and any bank account funds held in her name or held on her behalf by Margaret. The court also awarded Maria sole and exclusive possession of the proceeds of a personal injury claim she filed during the marriage.

The court awarded Richard his IRA and the contents of his employers' profit-sharing plan, finding that both were nonmarital property. Richard also was allowed to retain all furniture and personal property at the marital residence, as well as the 1985 Buick.

## OPINION

Before we consider the arguments raised by Maria in her appeal

from the trial court's judgment, we must address Richard's contention that Maria's notice of appeal was filed prematurely.

In his brief on appeal, Richard claims that although the trial court's judgment of dissolution was signed on September 12, 1990, at 11:30 a.m., it was not docketed until sometime after 4 p.m., 3½ hours after Maria filed her notice of appeal. According to Richard, this fact was established at "an extensive conference conducted by Richard's counsel on May 10, 1991, with numerous court clerks in the Domestic Relations Division."

■ Richard has attached to his brief an affidavit prepared by his counsel detailing counsel's discussions with the docket clerks. We find that this affidavit is incompetent and may not be used to support Richard's claim that Maria's appeal was premature.

In *Meyerson v. Software Club of America, Inc.* (1986), 142 Ill. App. 3d 87, 491 N.E.2d 150, this court held that matters in a brief not supported by the record will be disregarded and that documents which are not a part of the record will not be considered on appeal. Here, the information relied upon by Richard was not included in the record on appeal and Richard has made no request to supplement the record. Accordingly, because there is nothing in the record itself that indicates that Maria's appeal is untimely, counsel's affidavit and the portion of Richard's brief addressing this issue will be disregarded.

We now turn to the merits of Maria's appeal. Maria argues that the trial court erred in finding that the agreements she signed were valid and binding, because the evidence showed that she was unaware of the extent of Richard's property, she was not advised to consult an attorney before executing the agreement, and Richard never intended to rely upon the agreement.

■ Under Illinois law, an antenuptial agreement is valid at the time of execution if the parties enter into the agreement without fraud, duress or coercion. (*In re Estate of Hopkins* (1988), 166 Ill. App. 3d 652, 520 N.E.2d 414.) The rules governing contract construction are applicable to such agreements (*Hopkins*, 166 Ill. App. 3d at 656; *In re Estate of Klinker* (1979), 80 Ill. App. 3d 28, 399 N.E.2d 299), and under these rules, the fundamental issue is the intention of the parties. In ascertaining this intention, the conditions and circumstances surrounding the parties at the time of the agreement should be considered. *Klinker*, 80 Ill. App. 3d at 30; *Van Cura v. Drangelis* (1963), 43 Ill. App. 2d 205, 193 N.E.2d 205.

The marriage itself is considered sufficient consideration for the agreement (*Eule v. Eule* (1974), 24 Ill. App. 3d 83, 320 N.E.2d 506), and because it is not essential that the agreement contain reciprocal

provisions, the validity of the agreement is not impaired because one party fails or omits to waive the interest he or she would acquire in the prospective spouse's property (*Lee v. Central National Bank & Trust Co.* (1974), 56 Ill. 2d 394, 308 N.E.2d 605).

Illinois law also provides that if the parties are engaged to be married before the agreement is signed, a confidential relationship exists. In that situation, a presumption of concealment arises if the provisions made are disproportionate to the extent and value of one spouse's estate and that spouse has the burden of proving that the second spouse had full knowledge of the first spouse's property prior to signing the agreement. (*Hopkins*, 166 Ill. App. 3d at 656.) This presumption arises only when there is an engagement between the parties, placing them in a confidential relationship. *Debolt v. Blackburn* (1927), 328 Ill. 420, 159 N.E.2d 790; *Yockey v. Marion* (1915), 269 Ill. 342, 110 N.E.2d 34.

■ In the present case, the trial court accepted the testimony of Janina Dziengiel and Richard that the parties met in December 1984 and that Maria requested that Richard marry her so that she could remain in this country. The court also found that Maria signed and delivered the agreement to Richard and that it was only after this event that Richard accepted Maria's proposal. Thus, at the time the agreement was executed there was no confidential relationship between the parties. As a result, Richard does not have the burden of proving that Maria was aware of the extent and value of his property. *Hopkins*, 166 Ill. App. 3d at 656.

Additionally, there was testimony from Richard that he attempted to tell Maria the extent of his property, as well as testimony from Dziengiel that she informed Maria that Richard was worth about $100,000. Although not controlling, we find that this testimony supports our conclusion that Maria's claim that she was unaware of the extent of Richard's property has no affect on the validity of the agreement.

Having concluded that the agreement signed by Maria meets the requirement of Illinois law, we now consider Maria's claim that the agreement was invalid because she was not advised to consult counsel before executing it. Maria acknowledges that there is no requirement that the parties to an antenuptial agreement be represented by an attorney; however, she contends that the circumstances surrounding the execution of the agreement militate against a finding that it is valid. We disagree.

■ It is uncontested that Richard never requested the agreement. The trial court found that it was Maria who prepared the

agreement and presented it to Richard for the purpose of facilitating her marriage and thereby remaining in this country. Under these circumstances, we find that Maria's failure to seek legal advice before acting will not affect the validity of the agreement.

In response to Maria's contention that the agreement is invalid because it was not Richard's intent to rely upon it, we note the trial court's finding that Richard accepted Maria's proposal of marriage only after she gave him the agreement. In light of Richard's testimony that he never would have married Maria if she had not given him the agreement, we find that the trial court correctly concluded that Richard relied on the agreement in deciding to marry Maria.

Maria's next arguments concern the trial court's division of the parties' interest in the marital home. With regard to the home, Maria first points out that the trial court awarded her a lien of only $12,000 even though both she and Richard testified that she provided the $14,000 down payment from her nonmarital property. We agree that the award of only $12,000 was improper.

As Maria correctly contends, both parties testified that she contributed $14,000 toward the down payment on the marital home. In addition, the trial court specifically found in its outline that Maria's contribution was $14,000. In its later judgment, which incorporated the Outline, the amount of Maria's contribution was reduced to $12,000 without any explanation. Although we believe the trial court erred in making this reduction, for reasons that follow, we believe that Maria's contribution to the marital home is subject to the same transmutation that affected Richard's contributions.

Maria next argues that the trial court erred in finding that Richard's use of nonmarital assets to prepay the mortgage on the parties' home did not transmute the assets into marital property.

Section 503(c)(1) of the Illinois Marriage and Dissolution of Marriage Act provides that when marital and nonmarital property are commingled resulting in a loss of identity of the contributing estates, the commingled property shall be deemed transmuted to marital property. (Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(1).) Under section 503(c)(1), there is a rebuttable presumption that a contribution of nonmarital funds to a marital home held in joint tenancy constitutes a gift. (*In re Marriage of Mayzner* (1986), 144 Ill. App. 3d 645, 494 N.E.2d 615.) This presumption of transmutation may be rebutted by clear and convincing evidence that a gift to the marital estate was not intended. (*Zito v. Zito* (1990), 196 Ill. App. 3d 1031, 554 N.E.2d 541.) The fact that the commingling occurs after marital difficulties have arisen will support a finding that no gift to the marital estate was in-

tended. *In re Marriage of Guerra* (1987), 153 Ill. App. 3d 550, 505 N.E.2d 748.

In the present case, Richard's counsel argued and the trial court found that there was no intention to transmute the nonmarital assets and that the mortgage prepayments were made because of Richard's concern that he would not be able to make future payments because of his health and his impending retirement. However, Richard denied that he was planning to retire and stated that the prepayments were made to avoid paying interest on the mortgage. Whether we accept the trial court's finding or Richard's explanation of the prepayments, it is clear that Richard has not presented the clear and convincing evidence necessary to rebut the presumption that the nonmarital assets used to make payments on the jointly held marital home constituted a gift to the marital estate.

We make this finding with respect to all of the mortgage prepayments, including the final payment which Richard contends was made when the parties' relationship was severely strained. In *In re Marriage of Guerra* and *In re Marriage of Simmons* (1981), 101 Ill. App. 3d 645, 428 N.E.2d 1032, it was held that the presumption of transmutation was overcome when payments were made after the parties had separated and were no longer living together. Here, although both parties testified that difficulties arose in the marriage beginning in December 1988, the final mortgage payment was made in March of 1989. Richard characterized the parties' relationship at that time as nonexistent. However, the parties were still living together in the marital residence and continued to do so until December of 1989. The petition for dissolution of marriage was filed in May of 1989. Accordingly, we find Richard's testimony insufficient to rebut the presumption of transmutation.

Finally, Maria argues that other errors committed by the trial court warrant reversal. These include the trial court's finding that the agreement was valid, despite the fact that it contained no reciprocal waiver binding Richard, and the court's finding that Maria had a bank account containing approximately $5,800.

■ The fact that an antenuptial agreement need not be reciprocal has been addressed above. (See *Lee v. Central National Bank & Trust Co.*, 56 Ill. 2d 394, 308 N.E.2d 605.) As for Maria's other contention, a court in a divorce proceeding has jurisdiction to determine that a spouse has an interest in property held in the name of a third person. (*Van Vleet v. De Witt* (1902), 200 Ill. 153, 65 N.E. 677.) Here, there was evidence before the trial court that Maria had a joint savings account with her daughter and the tax returns of Maria and her

daughter showed substantial interest income for 1989. We find that based on these facts, there was support for the trial court's finding that Maria had a savings account or that Margaret was holding funds on Maria's behalf.

In conclusion, we affirm the trial court's finding that the agreement signed by Maria was valid and binding. However, we reverse the trial court's finding that Maria was entitled to a lien of only $12,000 and the finding that Richard's use of nonmarital assets to reduce the mortgage on the marital home did not transmute those assets into marital property. Accordingly, we remand for a redetermination of the parties' interests in the marital home.

For the foregoing reasons, the judgment of the circuit court is affirmed in part; reversed in part and remanded with directions.

Affirmed in part; reversed in part and remanded with directions.

SCARIANO and DiVITO, JJ., concur.