John **PENHALLOW**

v.

Susan M. **PENHALLOW.**

No. 93–137–Appeal.

Supreme Court of Rhode Island.

Nov. 21, 1994.

Robert D. Oster, Oster & Groff, Lincoln, for plaintiff.

William F. Holt, Kirshenbaum & Kirshenbaum, Cranston, for defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of Susan M. Penhallow (defendant) from an order of the Family Court invalidating the premarital agreement between her and her former husband, John Penhallow (plaintiff). The Family Court justice found that at the time it was executed by the parties, the premarital agreement was unconscionable and therefore invalid. Having invalidated the agreement, the justice ordered a different division of property between the parties, a division that the defen-

dant alleged did not comply with the statute governing the assignment of property upon divorce. The defendant also argued that the Family Court justice erred in holding her in contempt for failing to comply with an order while her timely appeal was pending, and further contended that the trial justice was predisposed against her. In this court's first interpretation of Rhode Island's Uniform Premarital Agreement Act (the act), G.L. 1956 (1988 Reenactment) chapter 17 of title 15, we vacate the portion of the Family Court judgment that invalidated the premarital agreement. For the reasons stated herein, we hold that because it was executed voluntarily, the agreement is valid.

## FACTS AND PROCEDURAL HISTORY

Susan O'Coin and John Penhallow were married on March 17, 1988, in Bellingham, Massachusetts. At the time of the marriage, defendant was fifty years old and plaintiff was seventy-eight. Prior to the marriage, plaintiff lived on his thirty-acre farm in Burrillville, Rhode Island. He had never married, had no issue or living siblings, and did not drive an automobile. The defendant had recently divorced after twenty-eight years of marriage, had two adult children from her previous marriage, and at the time she met plaintiff, lived in a house she owned in Woonsocket, Rhode Island, and worked as a realtor.

The parties met at or near plaintiff's farm in April 1987 (according to defendant) or October 1987 (according to plaintiff) when defendant drove by to look at some real estate listings. Despite conflicting testimony about who initiated the contacts, defendant's testimony that the parties saw each other on a regular basis up to the time of their marriage in March 1988 was unrebutted.

On the day of the wedding the parties signed a premarital agreement that had been drafted by a Rhode Island attorney whom defendant had contacted. Although the attorney knew that both parties owned real estate and personal property, he neither investigated the extent of their assets nor listed them in the premarital agreement. The attorney testified that he explained "each and every portion" of the agreement to the parties and that plaintiff "understood everything that was going on and also [said] that this was what he wanted." The attorney notarized the signatures of plaintiff and defendant on the agreement.

The premarital agreement provided (1) that all defendant's property would remain her separate property, (2) that plaintiff would transfer all his real estate into tenancy by the entirety with defendant, and (3) that plaintiff would transfer all his cash and the contents of safety deposit boxes into joint tenancy with defendant. Under the terms of the agreement, if defendant were to initiate a divorce, a separation, or an annulment of the marriage, she would be required to return to plaintiff all property she had acquired under the agreement. If, however, plaintiff were to initiate a divorce, separation, or annulment, then defendant would be entitled to retain 50 percent of the property she had acquired under the agreement.

After the wedding the couple resided in defendant's house in Woonsocket for approximately three-and-one-half years. The defendant testified that she would drive plaintiff to the farm in the morning, leave to carry out her own work, then stop by the farm to take defendant home with her to Woonsocket each night. The Family Court justice found that during the marriage, defendant "did take care of [John] physically and brought him back and forth to the farm and did, in fact, have sex with him to his satisfaction."

According to defendant, the marriage was a good one until plaintiff began to spend hours at a time with a younger woman who, with her daughter, was a tenant on the farm. The plaintiff allegedly told defendant that she was too old for him and that he liked "younger girl [sic]." A farm worker, Michael Kakowski (Kakowski), also lived at the farm and, according to defendant, owned seven or eight shotguns with which he shot or killed animals around the farm.

The defendant testified that on the evening of September 29, 1991, when she went to the farm to call for her husband, he refused to go home with her. According to defendant, when she went to the farm the following evening to bring plaintiff home, he became

angry at her, shouted that she should leave the farm, and said that he no longer wanted to see her. That same evening, defendant received a telephone call from plaintiff demanding that she return everything to him or she would "get in big trouble." The defendant testified that plaintiff then passed the telephone to Kakowski, who told defendant that she would "get killed or shot" unless she returned plaintiff's stocks and bankbooks.

On October 1, 1991, defendant filed a Complaint for Protection from Abuse with the Family Court. The court issued a temporary restraining order on the same day, requiring plaintiff to vacate defendant's Woonsocket home and enjoining plaintiff from interfering with defendant.

The plaintiff's version of events was markedly different from defendant's. He claimed that defendant took his bankbooks and had repeatedly refused his requests to return them. According to plaintiff, when he asked for his bankbooks again at the end of September 1991, defendant became upset at him, drove him to his farm, and shortly thereafter had plaintiff served with the temporary restraining order.

On October 25, 1992, plaintiff filed a Complaint for Divorce, alleging that "irreconcilable differences" led to the "irremediable breakdown of the marriage." In his complaint, plaintiff requested an equitable distribution of the marital estate whereas defendant prayed for a distribution of marital property in accordance with the premarital agreement.

During the trial, which lasted portions of nine days, plaintiff introduced as a witness a social caseworker from the Department of Elderly Affairs (DEA). The defendant had objected to this witness on the ground that plaintiff did not disclose her appearance to defense counsel until the day before the witness took the stand. The social worker testified that after Kakowski had reported a case of suspected elderly abuse, she and her case manager went to plaintiff's home in Burrillville on October 8, 1991, to conduct an investigation. Both Kakowski and the woman tenant were present with plaintiff at the start of the interview, but halfway through, the social caseworker asked them to leave because she felt that they might have been influencing plaintiff's responses. Over the objection of defendant, the witness stated that it was her opinion that the complaint for exploitation and psychological abuse on the part of defendant against plaintiff was founded.

On January 13, 1993, the Family Court justice issued a Decision Pending Entry of Final Judgment that granted plaintiff's complaint for divorce, invalidated the premarital agreement, and ordered a division of property under G.L.1956 (1988 Reenactment) § 15–5–16.1, as amended by P.L.1992, ch. 269, § 2 that governs the assignment of property pursuant to a divorce. Specifically, the order directed defendant to reconvey, *inter alia*, all her title and interest in the Burrillville property to plaintiff. Three days later, plaintiff filed a motion to adjudge defendant in contempt for failing to reconvey real estate and other property to plaintiff. Because of certain objections of defendant, the parties, by stipulation, agreed to vacate the Decision Pending Entry of Final Judgment and to submit the matter for a hearing. Subsequently, the Family Court justice entered an Amended Decision Pending Entry of Final Judgment (decision) on March 17, 1993. Immediately after the entry of judgment, plaintiff's motion to adjudge defendant in contempt was heard. The defendant filed a notice of appeal from the decision on the same day. On April 6, 1993, the Family Court ordered defendant to sign the deed of the Burrillville property on April 8, 1993, and to transmit the deed to plaintiff's counsel or be held in contempt.

The Family Court denied defendant's motion for stay of its order, and defendant immediately filed with this court a motion to stay the forced transfer, arguing that her appeal here stayed enforcement of the Family Court order. On April 8, 1993, this court denied the stay but modified the order to provide that the deed, after being signed by defendant, be deposited with the Registry of the Supreme Court instead of with plaintiff's counsel.

The defendant filed the instant appeal from the judgment of the Family Court pursuant to G.L.1956 (1981 Reenactment) § 14–1–52, as amended by P.L.1981, ch. 329, § 1.

## VALIDITY OF THE PREMARITAL AGREEMENT

### A. *Provisions of the Rhode Island Statute*

In order to assess the validity of the premarital agreement, we must examine the terms of the document in light of the provisions of the act. In this state all premarital or "antenuptial" agreements executed on or after July 1, 1987, "between prospective spouses made in contemplation of marriage and to be effective upon marriage" must comply with the provisions of the act. Because the agreement in controversy was "entered into" on March 17, 1988, it is subject to the provisions of the act. The Family Court justice found that the parties entered into the agreement "in accordance with [§ ] 15–17–1," the section of the act that defines the terms "premarital agreement" and "property." Sections 15–17–2 and 15–17–3 of the act set forth the requisite formalities and permissible content, respectively, of premarital agreements, while § 15–17–6 specifies the conditions that—if proven by the party against whom enforcement of the agreement is sought—render the agreement unenforceable. In the case before us, the Family Court justice invalidated the premarital agreement on the ground that it was unconscionable when it was executed by the parties. The defendant, on the other hand, contended that the agreement was valid and enforceable. We agree with defendant.

Section 15–17–2 requires that a "premarital agreement must be in writing and signed by both parties." It was undisputed that the instant agreement was in writing, and it was undisputed that both plaintiff and defendant signed the agreement on March 17, 1988. Although at trial plaintiff denied that he had signed the agreement, the Family Court justice made no finding of forgery, and plaintiff's counsel conceded at oral argument that plaintiff had signed the agreement voluntarily. Furthermore, although § 15–17–2 expressly states that a premarital agreement "is enforceable without consideration," at tri-

al, the attorney who notarized the parties' signatures testified that defendant provided as consideration "marriage and care" of the elderly gentleman. Thus, the formalities required by § 15–17–2 were met. Because it is undisputed that the parties married, under § 15–17–4, the agreement became effective upon the marriage.

Pursuant to § 15–17–3(a), parties to a premarital agreement may contract in respect to

"(1) The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located;

"(2) The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property;

"(3) The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event;

"(4) The modification or elimination of spousal support;

"(5) The making of a will, trust, or other arrangement to carry out the provisions of the agreement;

"(6) The ownership rights in and disposition of the death benefit from a life insurance policy;

"(7) The choice of law governing the construction of the agreement; and

"(8) Any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty."

### B. *Provisions of the Premarital Agreement*

█ The premarital agreement that was signed by plaintiff and defendant consisted of four sections. Section I recited the intent of the parties to "define and set forth the respective rights of each" and stated that the "parties intend and desire that all property owned by Susan M. O'Coin at the time of the marriage shall be her separate property, free from any and all claims by John R. Penhallow." Section II of the agreement obligated

plaintiff to transfer certain of his personal property into joint tenancy with defendant and all his real property into tenancy by the entirety with defendant. Insofar as the agreement set forth the rights and obligations of the parties with respect to their personal and real property, the subject matter of the agreement was clearly permissible under subsections (a)(1) and (2) of § 15–17–3.

Section III of the agreement called for the parties to "cooperate fully in executing, acknowledging and delivering any instruments required to accomplish the intent and to effectuate their agreement," thereby enunciating the obligations of the parties as permitted under § 15–17–3(a)(8).

Upon a divorce, a separation, or an annulment of the marriage, section IV of the parties' agreement provided for the disposition of property that was held in joint tenancy or in tenancy by the entirety during marriage. Because subsection (a)(3) of § 15–17–3 expressly allows parties to contract for a disposition of property upon "separation" or "marital dissolution," section IV of the agreement is clearly lawful under the provisions of the act.

### C. *Enforcement under the Act*

■ Analysis of the enforcement provisions in § 15–17–6 of the act reveals that, in Rhode Island, a party seeking to render an agreement unenforceable must meet a heavy burden. To avoid enforcement of a premarital agreement, the party against whom the enforcement is sought must show, pursuant to § 15–17–6(a) and (b), that

"(1) That party did not execute the agreement voluntarily; *and*

"(2) The agreement was unconscionable when it was executed *and*, before execution of the agreement;

"(i) That party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

"(ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; *and*

"(iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

"(b) The burden of proof as to each of the elements required in order to have a premarital agreement held to be unenforceable shall be on the party seeking to have the agreement declared unenforceable and must be proven by clear and convincing evidence." (Emphases added.)

When the Rhode Island Legislature adopted the Uniform Premarital Agreement Act in 1987, it substituted "and" for "or" at the end of subsection (a)(1) of § 15–17–6. *Unif. Premarital Agreement Act* § 6 9B U.L.A. 49 note (Supp.1994)(Action in Adopting Jurisdictions). The Legislature thus clearly evidenced the intent to preserve the validity of such agreements by requiring that the party challenging the enforceability of an agreement bear the burden of proving *all* the elements in § 15–17–6(a)(1) and (2). Moreover, as further evidence of a policy of maintaining the integrity of such agreements, the Legislature inserted into the enforcement section of the act subsection (b) of § 15–17–6, a subsection absent from the Uniform Premarital Agreement Act. *Id.* That addition places on the party seeking to have a premarital agreement declared unenforceable the burden of proving the above elements by "clear and convincing evidence," a standard under which the trier of fact "must believe that the truth of the facts asserted by the proponent is highly probable." *Parker v. Parker*, 103 R.I. 435, 442, 238 A.2d 57, 61 (1968)(citing *Cook v. Michael*, 214 Or. 513, 330 P.2d 1026 (1958)).

■ The plaintiff, as noted *supra*, to the surprise of his own attorney and opposing counsel, testified at trial that he was not present at the signing of the agreement and that he did not sign it. The plaintiff's counsel, however, candidly conceded at oral argument that plaintiff did sign the agreement voluntarily. Thus, plaintiff has failed to meet his burden of proving by "clear and convincing" evidence that he did not execute the agreement voluntarily. This issue is critical because without clear and convincing evidence of involuntariness, the agreement can-

not be rendered unenforceable. Consequently, we conclude that this agreement is enforceable.

We note that the trial justice invalidated the agreement because he found that it was "unconscionable." We disagree with that finding. If we assume *arguendo* that the trial justice correctly concluded that the agreement was unconscionable, such a finding still would not provide a sufficient basis on which to refuse its enforcement because, under the act, proof of *both* involuntary execution *and* nondisclosure and/or waivers are required *in addition to* a finding of unconscionability. Section 15–17–6.[1]

We also note that plaintiff has failed to prove defendant's unfair or inadequate disclosure of assets. At trial, defendant testified that prior to her marriage to plaintiff, she told plaintiff that she owned a house, a disclosure plaintiff never denied. He had, in fact, visited with defendant and her family at the house before the marriage. Thus, plaintiff failed to show by "clear and convincing" evidence that he was not "provided a fair and reasonable disclosure" of defendant's property.

■ The agreement between plaintiff and defendant provided that defendant's property be maintained as her separate property; that defendant would retain *nothing* from plaintiff if she initiated a divorce but would retain *half* of any and all property that she acquired under the agreement if plaintiff divorced her. The trial justice, however, found that defendant "acquired everything" through the agreement. It is well settled that the findings of fact made by a trial justice, sitting without a jury, are afforded great weight and "will not be disturbed by this court on appeal unless it can be shown that such findings are clearly wrong or that the trial justice misconceived or overlooked material evidence." *Casey v. San–Lee Realty, Inc.*, 623 A.2d 16, 19 (R.I.1993)(quoting *Raheb v. Lemenski*, 115 R.I. 576, 579, 350 A.2d 397, 399 (1976)). In the instant case the trial justice's finding that defendant "acquired everything" through the

agreement plainly contradicted the agreement's unambiguous language regarding property division. To the extent the trial justice based his finding of unconscionability on a misreading of the agreement, the finding is clearly erroneous.

■ Section 15–17–6(d) states that the "issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law," and under subsection (a)(2) the agreement must be shown to have been unconscionable "when it was executed." The act, like the Uniform Commercial Code and the Uniform Marriage and Divorce Act before it, establishes the standard of unconscionability in the negotiations between parties and thereby provides "protection against overreaching, concealment of assets, and sharp dealing not consistent with the obligations of marital partners to deal fairly with each other." *Unif. Premarital Agreement Act* § 6 cmt. 9B U.L.A. 376, 377 (1987). In light of the fact that at the time the agreement was executed, defendant had two adult children from a previous marriage whom she wanted to protect and the fact that plaintiff had no living relatives, we are of the opinion that the division of property set forth in the agreement does not arise to the unconscionable level of "overreaching" or "sharp dealing."

■ Although it is undisputed that plaintiff did not have the assistance of independent counsel when the agreement was signed, the act does not require the presence of independent counsel as a condition for the enforceability of an agreement. Although the issue has not previously been addressed by this court, other jurisdictions have refused to require independent counsel as a condition for enforcing premarital agreements. *See In re Marriage of Sokolowski*, 232 Ill.App.3d 535, 543–44, 173 Ill.Dec. 701, 707, 597 N.E.2d 675, 681 (1992)(holding there is no requirement that the parties to an antenuptial agreement be represented by an attorney); *Simeone v. Simeone*, 525 Pa. 392, 400–01, 581 A.2d 162, 166 (1990) (rejecting a *per se* re-

---

1. We do not here address the issue of whether a party, having conclusively proven that he or she executed a premarital agreement involuntarily, for example coerced by threats of death or serious bodily harm, may under due-process considerations avoid enforcement on that basis alone, without requiring proof of unconscionability and/or inadequate disclosure.

quirement that a party to a premarital agreement must have independent-counsel advice).

■ At trial, plaintiff's attorney attempted to elicit testimony from plaintiff regarding his physical and mental capacity to enter into contracts. The trial justice disallowed the testimony because plaintiff had failed to plead incapacity in his complaint. It is well settled that matters not properly raised at trial may not be raised for the first time on appeal, *Fiske v. MacGregor, Div. of Brunswick,* 464 A.2d 719, 726 (R.I.1983); *see also Rhode Island Hospital Trust National Bank v. de Beru,* 553 A.2d 544, 547 (R.I.1989); *Cok v. Cok,* 479 A.2d 1184, 1188 (R.I.1984), and thus the issue of plaintiff's capacity to enter into contracts is not properly before this court.

## EQUITABLE DISTRIBUTION OF PROPERTY UNDER § 15–5–16.1

After the Family Court justice invalidated the agreement between plaintiff and defendant, he proceeded to order a distribution of property under § 15–5–16.1, which provides guidelines for assignment of marital property upon a couple's divorce or separation. Because we hold that the agreement is valid and enforceable, we need not review the Family Court's property apportionment under the statute. Rather, we vacate the property apportionment ordered by the Family Court and direct that defendant's share be allocated in accordance with the terms of the premarital agreement.

## THE "SURPRISE" WITNESS

■ In the course of the trial, plaintiff sought to introduce the testimony of a social worker from the DEA who had interviewed plaintiff fourteen months before trial. The defendant's counsel objected on the ground that plaintiff had not given defendant sufficient notice of the witness. The trial justice overruled the objection, reasoning that the social worker "might be a very important witness * * * particularly in view of the fact [that plaintiff] is 83 years of age." In *Casey v. Casey,* 494 A.2d 80, 85 (R.I.1985), this court held, *inter alia,* that the trial justice neither abused his discretion nor committed

prejudicial error by allowing a surprise witness to testify because the party introducing the witness had limited time to communicate her decision to opposing counsel. In the instant case, the DEA had attempted to contact defendant regarding the alleged abuse; therefore, defendant was aware of the social worker's visit with her former husband. More importantly, the trial justice made no finding of fact on the issue of whether defendant had abused plaintiff and thus did not base his decision on the social worker's testimony. Therefore, we hold that the trial justice did not abuse his discretion in permitting the witness to testify.

In addition, we note that defendant's contention that she was erroneously held in contempt is also without merit insofar as the court's actions conformed with Rule 62(c) of the Rules of Procedure for Domestic Relations and Rule 8(a) of the Supreme Court Rules of Appellate Procedure. Because we sustain defendant's appeal in respect to the validity of the premarital agreement, we need not address the remaining issues raised by defendant.

We do not here decide, however, whether the defendant's filing of the Complaint for Protection from Abuse (complaint), which resulted in a temporary restraining order requiring the plaintiff to vacate the Woonsocket home, may have constituted the initiation of a separation that would preclude her from acquiring assets under the agreement. The temporary restraining order issued by the Family Court enjoined the plaintiff from interfering with the defendant *and* required the plaintiff to vacate the Woonsocket home, although the defendant did not ask in her complaint that the plaintiff be ordered to vacate her home. Therefore, we remand to the Family Court the question of whether the defendant's filing of the abuse complaint was the initiation of a legal separation between the parties.

In summary, the terms of the premarital agreement, which we hold is valid, will govern the apportionment of assets between the parties. We remand the case to the Family Court for its determination of whether the defendant's filing of the abuse complaint ini-

tiated a separation of the parties. If the Family Court finds that the answer is affirmative, then the defendant acquires nothing from the plaintiff under the agreement. If the answer is negative, *i.e.*, if the Family Court finds that the complaint did not initiate a separation, then the defendant shall retain half of the plaintiff's assets in accordance with the premarital agreement. In any event, the judgment granting a divorce between the parties remains undisturbed; counsel fees and alimony are denied. In the event the Family Court should require deeds heretofore executed by the defendant, said deeds are available in the Registry of the Supreme Court and will be subject to Family Court order. The papers in this case are remanded to the Family Court for further proceedings in accordance with this opinion.