*In re* MARRIAGE OF RICHARD C. JELINEK, Counterpetitioner-Appellant, and LINDA G. JELINEK, Counterrespondent-Appellee.

First District (1st Division)   No. 1—90—2550

Opinion filed April 12, 1993.

Davis, Friedman, Zavett, Kane & McRae, of Chicago (James T. Friedman, of counsel), for appellant.

Schwartz, Freidin & Associates, of Chicago (David L. Applegate, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

After 15 years of marriage, Linda Jelinek filed an action for dissolution against her husband, Richard, on October 5, 1987. Richard later filed a counterpetition for dissolution in 1989. Neither party disputed the grounds for dissolution, and the valuation and apportionment of the marital estate became the focus of the litigation. Linda dismissed her petition, and the case went to trial on Richard's counterpetition. Ultimately, the circuit court issued a judgment of dissolution which established the valuation and apportionment of the marital estate and the custody and support of the Jelineks' two children. Both parties now appeal, raising numerous issues as to the propriety of the circuit court's judgment.

For reasons which follow, we affirm in part, reverse in part, and remand the cause for further proceedings.

In 1969, Richard, three other individuals, and a venture capital firm founded Medicus, a company which developed and marketed software systems in the health field. The founding of Medicus preceded the parties' marriage by three years. Richard's premarital holdings in the company consisted of 40,000 shares of common stock, which had been purchased with an unsecured loan. During the marriage, Richard paid some of this loan with marital funds, and the balance of the note was later forgiven. The forgiven loan was reflected as income in the couple's joint tax filings for the years 1975 and 1976.

At the time of the couple's 1972 marriage, Linda operated a small boutique, owned a "duplex," and maintained checking and savings accounts in Dallas, Texas. On June 27, 1975, Richard signed a written agreement stating that Linda's assets at the time of the marriage were Linda's "sole and separate property, in which I have no interest whatever."

In 1975, the couple adopted the first of two children, Hope Linda, born on August 17, 1975, and in 1979, the couple adopted their second child, Christopher, born on February 11, 1979. The couple also purchased marital homes in Evanston, Illinois, and Aspen, Colorado. During this time, Linda maintained the marital homes and resumed her business by working out of her home. For a period from 1980 to June 1988, Linda operated her business for a time in a building which she and Richard purchased jointly on Custer Street in Evanston, Illinois. Linda retained her income from her business and other investments in 13 separate bank and investment accounts held in her name. Linda claimed her business was never financially successful.

By 1975, Richard's common share holdings in Medicus diminished, and he possessed 38,500 common shares. In early 1975, the directors of Medicus, in an attempt to make the company more attractive for resale, issued shares of class B stock to key investors and employees. As a result, Richard received 40,000 shares of this newly created class B stock. The company's tax records indicate that this transaction was classified as "compensation" for taxation purposes. Richard, however, was required to declare the stock as ordinary income when it was delivered to him. Apparently, he could not afford to take the shares all at once so he spread the vesting of the stock over five years with a defeasibility provision to defer the tax. During the trial, various people associated with the corporate transaction testified that the class B stock was not compensation for Richard, but rather a restoration of Richard's original equity in the company. To offset the tax cost that Richard would incur as the class B stock vested at market value, Medicus agreed to pay Richard additional compensation in the form of dividends and director's fees to eliminate the tax cost. These extra payments were deposited in the parties' joint account. Linda countered this testimony by referring to contemporaneous corporation documents which referred to the transaction as "compensation."

Medicus was later sold to the Whittaker Corporation. The sale, with regard to Richard, was composed of a six-part, $1 million transaction. Relevant here are only two components of the sale, in which Richard received $279,125 for his initial 38,500 shares of Medicus common stock and an additional $141,375 for 19,500 shares of his class B stock. Thus, Richard received a total of $420,500 for his original common stock holdings and the later acquired class B stock.[1] This

---

[1] Left unclear is what happened to the remaining 20,500 shares of class B stock which Whittaker did not purchase.

amount was wired to a Continental Bank account held in Richard's name. Richard later used the $420,500 for various financial investments which ultimately grew to over $12.7 million.

In addition to the marital homes, the couple also acquired several rental properties, a number of automobiles, furniture, and various pieces of art during the marriage. Linda also purchased some property in Taos, New Mexico, in her own name, which she and Richard agreed in writing would be her separate, nonmarital property.

Richard testified that he recalled an oral agreement he had entered into with Linda, predating the marriage, in which it was agreed that the Medicus holdings were his nonmarital property.

In a written judgment of dissolution, the trial judge specifically found that Linda's testimony was "inconsistent and frequently lacked credibility" and that Richard "was a more credible witness." The trial judge divided the marital estate with Richard to receive 60% and Linda to receive 40%. The judge also found that Richard had failed to prove, by clear and convincing evidence, the existence of the claimed oral agreement. The trial judge made the following findings with regard to Richard's holdings in Medicus:

> "12. The HUSBAND owned 40,000 shares of common stock of The Medicus Corporation, later known as Medicus Affiliates, prior to the marriage which was his non-marital property, of which 38,500 shares were sold in 1978 for $279,125. That sum was the HUSBAND's non-marital property, which should be awarded to him after subtracting as reimbursement $1,778 paid for the 1975 settlement of the HUSBAND's Note ***; $5,883 income taxes from the settlement in 1975 and $7,232 income taxes from the settlement in 1976, all marital contributions to his non-marital property.
>
> 13. The HUSBAND's remaining interests in Medicus Systems Corporation, Medicus Affiliates, Whittaker Corporation, Mediflex Systems Corporation, Medicus Systems Corporation, HBO Company, Jeliker, Inc., Knowledge Data Systems, Inc. and Jelinek, Inc. all [are] marital property for the following reasons, among others:
>
> A. In 1975, HUSBAND acquired 40,000 shares of Class B stock of Medicus Systems Corporation, which were received as compensation for his services during the marriage;
>
> B. In 1977, HUSBAND acquired Options to purchase 12,000 shares of Class B stock of Medicus Systems Corporation ('Medicus Options') which were received in exchange for 12,000 of the

40,000 shares of Class B stock of Medicus Systems Corporation, described above."

The trial judge denied maintenance to Linda and, based on the couple's financial status, deviated from the statutory guidelines in establishing the child support. Each party was ordered to bear its own attorney fees and costs. The trial judge also ordered Richard to pay certain realty taxes on property awarded to Linda.

## I

Richard contends that the trial judge erred in finding that the parties had not entered into a valid premarital agreement which classified their assets. In support of his argument, he asserts that a valid agreement in contemplation of marriage may be oral, that he and Linda both admitted the existence of such an agreement at trial, and that the couple's consistent course of conduct during the marriage supports the existence of such an agreement.

Section 503 of the Illinois Marriage and Dissolution of Marriage Act (the Dissolution Act) provides that " 'marital property' means all property acquired by either spouse subsequent to the marriage except *** property excluded by valid agreement of the parties." (Ill. Rev. Stat. 1987, ch. 40, par. 503(a)(4).) Moreover, the statute creates a presumption that "all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage, including non-marital property transferred into some form of co-ownership between the spouses, *** is *** marital property, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, or community property." (Ill. Rev. Stat. 1987, ch. 40, par. 503 (b).) The statutory presumption is overcome by a showing that the property was acquired by a method listed in section 503(a). Ill. Rev. Stat. 1987, ch. 40, par. 503(b).

■ The Dissolution Act does not define what constitutes a valid agreement for purposes of section 503(a)(4). The Historical and Practice Notes, however, indicate, to an extent, that such agreements are antenuptial agreements: "[t]he parties may agree *inter se*, based upon sufficient consideration, to treat as non-marital property that which would otherwise be treated as marital property. [Citation.] Antenuptial agreements have been upheld which abrogated the existence of community property rights during the marriage. [Citations.] Such an agreement must be set forth as an exhibit to the pleadings." (Ill. Ann. Stat., ch. 40, par. 503, Historical & Practice Notes, at 462 (Smith-Hurd 1980).) Under the Dissolution Act, an antenuptial agreement,

entered into by persons competent to contract, may exclude the operation of the law, including the marital property provisions of section 503, and determine the rights each will have in the other's property during the marriage. (*In re Marriage of Burgess* (1984), 123 Ill. App. 3d 487, 462 N.E.2d 203. See also Ill. Ann. Stat., ch. 40, par. 503, Historical & Practice Notes, at 61-62 (Smith-Hurd Supp. 1991).) Thus, we disagree with Richard's contention that the "valid agreement" of section 503(a)(4) does not amount to an "antenuptial agreement."

In Illinois, an antenuptial agreement is enforceable only if in writing. (*Lee v. Central National Bank & Trust Co.* (1974), 56 Ill. 2d 394, 308 N.E.2d 605; *McAnnulty v. McAnnulty* (1887), 120 Ill. 26, 11 N.E. 397.) Since both parties admit that no written agreement was executed, the trial judge did not err in finding that no valid agreement as to nonmarital property existed.

Even if we were to assume an oral agreement is sufficient to classify assets of a marital estate as nonmarital, the evidence presented here does not prove by a clear and convincing standard that such an oral agreement was ever made. See *In re Marriage of Phillips* (1992), 229 Ill. App. 3d 809, 817, 594 N.E.2d 353 (statutory presumption overcome only by "[c]lear and convincing" evidence).

Contrary to Richard's allegations, Linda never admitted the existence of an oral agreement. Mention of separate property was found only in a 1975 handwritten memorandum of Linda's separate property and in a typed 1978 acknowledgement, both signed by Richard, that realty purchased by Linda in Taos, New Mexico, with her separate funds, would remain Linda's separate property. Linda testified that the two documents were executed to protect her nonmarital property from claims or potential claims from Richard's former wife and his children from that union, in the event of Richard's death. None of the written documents refer to any separate property in relation to Richard and his Medicus holdings. Indeed, the two documents evince that, when the couple wanted property to be classified as nonmarital, they reduced such an intention to writing. Therefore, we cannot agree with Richard's suggestion that the couple's consistent course of conduct indicated an oral agreement was in effect. Accordingly, the circuit court did not err in finding that no valid agreement was entered into by the parties, prior to their marriage, concerning the classification of nonmarital property.

## II

Richard next challenges the trial judge's finding that Richard's class B stock was part of the marital estate. He insists that the asset

represented an increase in the value of his premarital equity and, as a result, the money he received during the sale of the corporation to the Whittaker Corporation and the investments derived from it are all nonmarital property because they were obtained by an exchange of premarital property, that is, Richard's original equity.

Before the court may dispose of property upon dissolution of marriage, the property must be classified as either marital or nonmarital. (*In re Marriage of Durante* (1990), 201 Ill. App. 3d 376, 381, 559 N.E.2d 56.) The classification will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. (*In re Marriage of Landfield* (1991), 209 Ill. App. 3d 678, 689, 567 N.E.2d 1061, *appeal denied* (1991), 139 Ill. 2d 597, 575 N.E.2d 916.) As noted above, the disposition of property upon dissolution of marriage is governed by section 503 of the Dissolution Act. (Ill. Rev. Stat. 1987, ch. 40, par. 503.) Subparagraphs (a) and (b) of the statute call for classification of property held by the parties as follows:

"(a) For purposes of this Act, 'marital property' means all property acquired by either spouse subsequent to the marriage, except the following, which is known as 'non-marital property':

(1) property acquired by gift, legacy or descent;

(2) property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, legacy or descent;

(3) property acquired by a spouse after a judgment of legal separation;

(4) property excluded by valid agreement of the parties;

(5) any judgment or property obtained by judgment awarded to a spouse from the other spouse;

(6) property acquired before the marriage;

(7) the increase in value of property acquired by a method listed in paragraphs (1) through (6) of this subsection, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c) of this Section; ***
    ***

(b) *** all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage is presumed to be marital property ***. The presumption of marital property is overcome by a showing that the property was acquired by a method listed

in subsection (a) of this Section." Ill. Rev. Stat. 1987, ch. 40, pars. 503(a), (b).

Richard suggests that the class B stock can be traced to his original premarital equity. Tracing of funds is a procedure which allows the court to find that property which would otherwise fall within the definition of marital property is actually nonmarital property under one of the statutory exceptions. (*In re Marriage of Scott* (1980), 85 Ill. App. 3d 773, 777, 407 N.E.2d 1045.) A party claiming that property is nonmarital by virtue of sections 503(a)(1) through (a)(6) has the burden of proof. *Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 446 N.E.2d 499.

We preface our discussion by noting that no case in Illinois is directly on point with regard to the class B stock issue which we consider to be the focal point of this case. In addition, our review of this issue has been unduly hampered by both parties' less than clear presentation of the nature of the transactions which resulted in Richard's acquisition of the asset in 1975. For example, the briefs contain references to exhibits which were introduced into evidence during the trial; however, none of those exhibits were filed with the record on appeal. Although the parties have included copies of some of the exhibits in the appendices to their briefs, we wish to point out that these are inadequate substitutes for the actual exhibits. Nevertheless, we have reviewed the testimony carefully and conclude that the class B stock cannot be considered marital property.

Our analysis begins with the observation that Richard no longer held any type of Medicus stock at the time of the trial. All the stock had been sold, and the proceeds of that sale—$420,500 and the subsequent reinvestments of that amount—are all that remain of the asset. Thus, we must trace the source of the $420,500: Richard's 1969 Medicus holdings. Richard's premarital 40,000 common shares were undeniably nonmarital property under section 503. Linda claims that the 40,000 class B shares were "acquired" during the marriage and, as a result, were properly considered marital property under section 503. We disagree. The class B shares were given to Richard in order to preserve his proportionate share of ownership in the company, and his right to receive these shares clearly was rooted in his premarital business property interest. Such an interest retains its nonmarital classification despite any increase in its value which may occur during the course of the marriage. (See *Bentley v. Bentley* (1981), 84 Ill. 2d 97, 417 N.E.2d 1309 (property acquired after marriage was to be considered nonmarital where the property represented the appreciated value of a nonmarital asset); *In re Marriage of Wilder* (1983), 122 Ill. App.

3d 338, 461 N.E.2d 447 (the change in the form of a premarital business during the marriage, which resulted in the increase in the value of husband's premarital holdings, remained nonmarital property). Accord *Cate v. Cate* (1991), 35 Ark. App. 79, 812 S.W.2d 697 (increase in the value of premarital interest during marriage constitutes nonmarital property); *Hoffmann v. Hoffmann* (Mo. 1984), 676 S.W.2d 817 (increased value of an equitable interest in corporation, during marriage, remains nonmarital property). See also Rosenhouse, Annot., *Divorce & Separation: Appreciation in Value of Separate Property During Marriage Without Contribution By Either Spouse as Separate or Community Property*, 24 A.L.R.4th 453 (1983).) Our review of the record indicates that the class B shares were identical to the common stock, but they did not carry any dividend rights and did not increase Richard's original percentage of ownership in the company. To that end, it was no mere coincidence that Richard "received" a number of class B shares (40,000) which matched his original holdings in the company (40,000). In light of this, we view Richard's acquisition of the class B stock, under the circumstances presented here, as analogous to a stock split or stock dividend. In such cases, our supreme court has held that the split or dividend is to be considered as an appreciation in value to the premarital holding (*In re Marriage of Smith* (1981), 86 Ill. 2d 518, 533, 427 N.E.2d 1239, citing *In re Marriage of Komnick* (1981), 84 Ill. 2d 89, 417 N.E.2d 1305) and would remain nonmarital property subject to a right of contribution. *In re Marriage of Smith*, 86 Ill. 2d at 533, citing *In re Marriage of Komnick*, 84 Ill. 2d at 96.

Although the above-described financial and corporate machinations are not completely clear, it is apparent that Richard's original 40,000 shares of common stock in Medicus had diminished so as to decrease his original ownership percentage in the company. Richard received the additional 40,000 shares of class B stock, not as compensation for his services, but as a method to restore his *premarital* equity. Support for our conclusion can be found in the testimony and the exhibits presented at the trial. William G. Brown, the corporate attorney at the time, stated that from Medicus' inception in 1969 until 1975, various new shareholders had "come in as investors" to Medicus and, as a result, Richard's equity had decreased. In fact, Richard was the sole investor remaining from the 1969 founding. To counter this and to make the company attractive for resale, the class B stock was created. Brown further testified that the purpose of the class B stock issuance was to insure that management would get a return of their investment when the company was sold. Indeed, this purpose is

echoed in one of the contemporaneous documents relied upon by Linda, which listed the objectives of the program to "begin to provide a return for investors in Medicus" and to "strengthen" management.

■ Although these documents classified the transaction as "compensation" as Linda correctly points out, we note that those same documents also refer to investors as well as to employees. The documents state that the corporation "shall issue" the stock to officers as well as employees. Particularly noteworthy is the directors' resolution issuing the class B stock to Richard: the stock was issued to Richard, not for Richard's services as the trial judge found, but in "the Corporation's best interest." Richard himself testified that the corporation had given him "free" stock and that he had received extra compensation from the company in order to offset the tax consequences to him as a result of the transaction. Moreover, board members as well as employees received the new stock. In that regard, we cannot overlook the fact that Richard's relationship to the company was more than that of a regular employee. Richard was one of the company's founders, served as a managing shareholder, and was an investor. For these reasons, the testimony adduced at the hearing provided a more revealing look at the transaction than the "paper trail" left by the corporate and tax experts at the time. Accordingly, we must reverse the lower court's determination that the asset was compensation because it is against the manifest weight of the evidence. The class B stock represented an appreciation of Richard's premarital equity in Medicus. Thus, any money he received from the Whittaker Corporation for the class B shares must also be considered nonmarital property under the exchange exception of section 503. Assets exchanged for separate, nonmarital property remain separate property regardless of the number or type of postmarital exchanges, absent an intent to transmute. (See, *e.g., In re Marriage of Siddens* (1992), 225 Ill. App. 3d 496, 499, 588 N.E.2d 321, *appeal denied* (1992), 145 Ill. 2d 644, 596 N.E.2d 637; *In re Marriage of Thacker* (1989), 185 Ill. App. 3d 465, 467-69, 541 N.E.2d 784.) Upon remand, the circuit court is to consider the $420,500 and its proceeds as nonmarital property, subject to a right of contribution.

Linda argues that Richard's investments constituted a "marital contribution" to his nonmarital property, and, as such, the marital estate must be reimbursed because of the significant appreciation of the asset.

Under the Dissolution Act, reimbursement is required when one estate of property makes a contribution to another estate of property or when a spouse contributes personal efforts to nonmarital property.

(Ill. Rev. Stat. 1987, ch. 40, par. 503(a)(6); see also *In re Marriage of DiAngelo* (1987), 159 Ill. App. 3d 293, 512 N.E.2d 783.) In the case of personal efforts, no reimbursement is to be made unless the effort is significant and results in substantial appreciation of the nonmarital property. (*In re Marriage of Morse* (1986), 143 Ill. App. 3d 849, 493 N.E.2d 1088.) The correct procedure to be applied under section 503(c)(2) is to determine whether either spouse, Linda or Richard, contributed significant personal effort toward the investments which resulted in the substantial appreciation of the investments. (Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(2).) Personal effort is looked upon as a contribution by the marital estate; therefore, Richard's contribution of personal effort toward his nonmarital property, if any, may entitle the marital estate, not Linda, to reimbursement from the nonmarital estate receiving the contribution. (Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(2).) However, only the appreciation resulting from significant personal effort will entitle the marital estate to reimbursement, not the appreciation which results from inflation or other factors external to the marriage. (Ill. Rev. Stat. 1987, ch. 40, par. 503(a)(7).) Based upon the foregoing, upon remand, the trial judge should reexamine the valuation of the investments in order to determine whether Richard's personal efforts entitle the marital estate to reimbursement. To that end, the trial judge should consider appreciation due to factors external to the marriage. See *In re Marriage of Morse*, 143 Ill. App. 3d at 855.

### III

Richard next argues that the trial judge abused his discretion in awarding Linda 40% of the marital assets. Linda, too, challenges the determination, maintaining that she should have been awarded a greater share of the estate. Linda also argues that the trial judge erred in his determination of the value of the marital estate.

We note that our decision to set aside the trial judge's classification of the class B stock as marital property causes a significant change in the valuation of the marital estate as a whole. Therefore, upon remand, the trial judge is instructed to consider the enhanced value of the nonmarital property in his reexamination of the apportionment and the distribution of the marital estate with regard to each party. See *Bentley v. Bentley*, 84 Ill. 2d at 97; *In re Marriage of Harmon* (1985), 133 Ill. App. 3d 673, 479 N.E.2d 422.

As to the trial judge's valuation of the other marital assets, such a decision will not be disturbed on appeal if the determination falls within the range testified to by the experts. (*In re Marriage of Wein-*

*berg* (1984), 125 Ill. App. 3d 904, 466 N.E.2d 925.) Conflicting testimony concerning the valuation of assets in a dissolution proceeding is a matter to be resolved by the trier of fact, who ultimately must assess the credibility of the witnesses and the weight to be given their testimony. *In re Marriage of Ayers* (1980), 82 Ill. App. 3d 164, 402 N.E.2d 401.

A review of the record reveals that the circuit court computed the valuation of the estate after hearing extensive testimony from expert witnesses. Moreover, many of the valuations were based on appraisals by appraisers selected jointly by the parties. We, therefore, see no reason to disturb the circuit court's findings.

## IV

Both Linda and Richard contend that the trial judge's deviation from the statutory guidelines in establishing child support constituted error which necessitates reversal. We agree.

The judgment of dissolution provided:

> "The Court finds cause to deviate from the minimum child support guidelines contained in Section 505 of [the Dissolution Act] based on the financial resources of both parties and their ability to satisfy the support needs of the children by expenditures below these guidelines."

The trial judge awarded the parties joint custody of the children, with Richard to pay Linda $7,500 per month in child support. Richard also was ordered to pay 60% of the children's private school tuition and fees, in addition to a portion of the children's uninsured medical expenses.

In determining the amount of child support to be charged to a party, the trial judge must consider the factors set forth in section 505 of the Dissolution Act. (Ill. Rev. Stat. 1987, ch. 40, par. 505.) Those statutory factors enumerated in section 505(a)(2) need not be considered, however, if the trial judge is following the guidelines outlined in section 505(a)(1). (Ill. Ann. Stat., ch. 40, par. 505, Supplement to Historical & Practice Notes, at 133 (Smith-Hurd Supp. 1991).) See also *In re Marriage of Tatham* (1988), 173 Ill. App. 3d 1072, 1093, 527 N.E.2d 1351.

■ Here, the trial judge clearly did not apply the statutory guideline, which would have put the award at 25% of the supporting parent's income. (See Ill. Rev. Stat. 1987, ch. 40, par. 505(a)(1).) Since the guideline was not used, the trial judge was required to consider the statutory factors of section 505(a)(2). The trial judge here noted that it had considered the relevant factors in setting forth the struc-

ture of the child support. However, a review of the record reveals that little evidence was adduced as to the needs of the children. For example, we note that figures provided by Linda in calculating the children's expenses include expenses for maintaining the Evanston and Colorado homes awarded to Linda, which totalled $48,256. Such expenditures have been condemned. In *In re Marriage of Stockton* (1988), 169 Ill. App. 3d 318, 327, 523 N.E.2d 573, the appellate court held that apportioning amounts of the household expenditures to a child "results in an exaggerated figure of support." Based on the foregoing and the lack of evidence presented at trial as to the issue of child support, the trial judge's determination of child support must be reversed and remanded for recalculation of the child support award in accordance with section 505(a)(2) of the Dissolution Act.

## V

■ Richard next contends that the trial judge erred by ordering him to pay certain realty taxes on property awarded to Linda. The court appears to have raised this issue *sua sponte*, some eight months after the close of evidence. Although neither party briefed or argued this issue, the trial judge ruled that Richard was to pay the accrued realty taxes for property being awarded to Linda. This decision apparently was based on a temporary support order previously entered into by the parties on November 29, 1988. That order required Richard to pay the real estate taxes incurred from September 1, 1988, through December 31, 1988, without prejudice to the right to demand a hearing *de novo* on the temporary support motion. The next temporary agreed order was entered on September 8, 1989, and provided that Richard pay the real estate taxes incurred from August 1, 1989, through January 1, 1990, without prejudice. Another temporary order extended the September 8, 1989, order for another month without prejudice.

Based on the nature of these temporary orders and on the fact that Richard was entitled to a *de novo* hearing on this issue, the trial judge abused his discretion in ordering the realty tax payments. This is especially true where, as here, no argument was made on this issue and all previous references were to "incurred" realty taxes and not "accrued" taxes.

## VI

■ Linda challenges the trial judge's finding against her on her claim of dissipation of the marital estate. Linda's evidence on this claim was contained in summary form in a series of exhibits. The

court awarded Linda $43,483, the amount of the marital estate she claimed Richard had used to pay the expenses of his current paramour, Julie Stewart. Moreover, Linda was awarded an additional $38,000 allegedly used by Richard to furnish his Near North side apartment.

Generally, dissipation involves one spouse's use of marital property for a selfish purpose unrelated to the marriage at a time when the marriage is undergoing an irretrievable breakdown. (*In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, 511 N.E.2d 676.) Determinations regarding dissipation are matters within the trial judge's discretion and may not be disturbed absent a showing of an abuse of that discretion. *In re Marriage of Kaplan* (1986), 149 Ill. App. 3d 23, 500 N.E.2d 612.

Here, Linda's allegations of dissipation were general and vague. Furthermore, little evidence of the alleged dissipation was presented from either the witness stand or through the numerous documents used throughout the trial as exhibits. Accordingly, the trial judge's decision on this matter will not be disturbed.

## VII

■■ Finally, Linda contends the trial judge erred in ordering her to pay all her attorney fees, costs, expenses and expert witness fees. Pursuant to a post-judgment settlement agreement entered into with her trial attorneys during the pendency of this appeal, Linda's attorney fees are now fixed at $235,000.

As noted previously, our treatment of the class B stock changed significantly the value of the marital estate as a whole. Although the amount of attorney fees has been agreed upon by Linda and the law firm which represented her at trial and has been paid in full by Linda, on remand, the trial judge should consider whether Linda is entitled to any reimbursement from Richard for these fees. See *In re Marriage of Morse*, 143 Ill. App. 3d at 856.

The judgment of the circuit court, therefore, is affirmed in part, reversed in part, and remanded to the circuit court for further proceedings consonant with this opinion.

Affirmed in part; reversed in part and remanded.

MANNING, P.J., and BUCKLEY, J., concur.