2023 IL App (2d) 210615-U
No. 2-21-0615
Order filed September 5, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| HEIDI BESS, | ) | of Lake County. |
| | ) | |
|     Petitioner-Appellee and | ) | |
|     Cross-Appellant | ) | |
| | ) | |
| and | ) | No. 18-D-1496 |
| | ) | |
| ARTHUR G. BESS, III, | ) | |
| | ) | Honorable |
|     Respondent-Appellant and | ) | Janelle K. Christensen, |
|     Cross-Appellee. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding that respondent's investment account, as well as properties acquired through leveraged collateral of assets held in that investment account, was not against the manifest weight of the evidence. The trial court's finding that respondent's capital corporation and a property purchased by that corporation were his non-martial property was not against the manifest weight of the evidence.

¶ 2    Respondent, Arthur G. Bess, III. (Art), appeals from the trial court's judgment for dissolution of marriage and denial of his post-judgment motion for reconsideration. He contends that the trial court erred in classifying a certain investment account and its contents as marital

property; specifically its finding that it could not determine by clear and convincing evidence that stock held in a Raymond James x7178 account was non-marital. Art argues that the trial court's erroneous finding created a "domino effect" on the classification of other alleged non-marital assets including other stock and real estate. Petitioner, Heidi Bess, cross-appeals from the dissolution judgment and partial denial of her post-judgment motion to reconsider. She contends that the trial court erred classifying a corporation formed by Art during the marriage as his non-marital property. Further, she contends that the trial court erred in classifying certain real estate acquired during the marriage as Art's non-marital property.

¶ 3                                    I. BACKGROUND

¶ 4      On September 11, 2018, Heidi filed a petition for dissolution of marriage. The parties married on April 26, 1986, and had three children. All three children were emancipated at the time of the dissolution proceedings. At the time of the dissolution judgment, Heidi was 56 years old, Artwas 70. Prior to the marriage, Art had an interest in Bess Hardware before ultimately taking full ownership from his father. Throughout the marriage, Art worked at Bess Hardware and was its sole shareholder.

¶ 5      Relevant here, Art maintained that the following assets were his non-marital property: (1) a residence located at 1875 Willow Road, Northfield; (2) a residence and rental property located in Reddington Florida (Casa Bonita); (3) a 50% interest in BeachLife Properties, LLC (BLP); (4) a real estate management entity called Art Bess Capital Corporation (ABCC); and (5) Raymond James securities account x7178 and the contents therein.

¶ 6      After some lengthy pretrial proceedings, trial commenced on October 30, 2020, and continued over nine non-consecutive days, finally culminating on December 10, 2020. The following recitation of facts recounts the matters relevant to our analysis on appeal. The focus of

our fact recitation will be the evidence presented and the trial court's findings as to the Raymond James securities account x7178.

¶ 7                                **Raymond James x7178 account**

¶ 8      As of September 30, 2020, the Raymond James x7178 account contained the following shares of stock: (1) 3,000 AT&T shares; (2) 1,000 AstraZeneca shares; (3) 27,500 Bank of America shares; (4) 1,000 Bristol-Myers shares; (5) 1,000 Disney shares; (6) 15,000 General Electric shares; (7) 2,000 Gilead shares; (8) 2,000 Intel shares; (9) 58,000 JP Morgan Chase shares; (10) 1,000 Moderna shares; (11) 5,000 Pfizer shares; (12) 2,000 Spirit shares; (13) 22,772 Wintrust shares. It is important to note that Art did not retain an expert to testify as to the tracing of this stock at trial.

¶ 9                          Tracing of JP Morgan Chase stock shares

¶ 10     The evidence showed how the JP Morgan Chase shares originated through a very complex tracing of the stock. In 1985, prior to the marriage, Art's financial statement showed that he owned 3,913 shares in five community banks. In late 1986, Charter Bank group subsumed the five community banks and Art received 8 stock certificates totaling 25,074 shares of Charter Bank stock in April 1987.  He testified that he kept the stock certificates in a locked safe at his place of business, Bess Hardware. Photocopies of the stock certificates were admitted into evidence.

¶ 11     In March 1988, NBD Bancorp acquired Charter Bank Group. In September 1988, Art acquired 9 NBD stock certificates totaling 21,901 shares. In December 1990, Art's shares of NBD stock grew to 34,944 shares. His July 10, 1992, financial statement showed that he then owned 52,416 shares of NBD stock. Art stated that he never sold any of the NDB stock during this time. However, he sold 4,108 shares of NBD stock in 1992 for a capital gain of $119,569, as reflected

in his 1992 federal income tax return. At trial, Art testified that he was "pretty certain that he sold NDB stock" before it was later acquired by First Chicago NBD (FCNBD).

¶ 12     His December 31, 1994, financial statement showed he then owned 49,640 shares of NBD stock. Art testified that he continued to keep the stock certificates in a locked safe at Bess Hardware. Unlike the Charter Bank stock certificates, photocopies of the NBD stock certificates after September 1998 were not introduced into evidence, although the value of the NBD shares continued to increase annually.

¶ 13     In 1995, NBD merged with First National Bank of Chicago and formed FCNBD. Art could not produce FCNBD certificates but insisted at trial that he turned all of the information over in discovery. His October 16, 1996, financial statement showed that he then owned 49,640 shares of FCNBD stock, the same number of shares in NBD stock that he listed on his December 31, 1994, financial statement. His July 9, 1997, financial statement showed he then owned 49,640 shares of FCNBD stock. No testimony or evidence was offered on the exchange rate following the 1995 merger forming FCNBD. His January 5, 1998, financial statement showed that he still then owned 49,640 shares of FCNBD stock. Art maintained that he did not purchase any additional shares of FCNBD stock between 1996 and 1998. He further testified that he kept FCNBD stock certificates in a locked safe at Bess Hardware.

¶ 14     On May 1, 1997, Art opened a Baird investment account x2958 (Baird account) and stock margin account. The Baird account was opened with $674.10 in cash and 700 shares of Quixote stock, the source of which was unidentified. 9 shares of Toro Company stock were transferred into the Baird account on July 25, 1997, the source of the funds used to purchase was unidentified. On July 29, 1997, Art sold the Toro stock and purchased 1,000 shares of Mercury Financial Company stock on July 30, 1997. On March 26, 1998, Art purchased 250 shares of Compaq Computers stock

and sold the 700 shares of Quixote stock. On May 21, 1998, Art used his stock margin account, secured by the shares held in his Baird account, to purchase 400 shares of Accustaff stock, 275 shares of Compaq Computers stock, 275 shares of Intel stock, 225 shares of MGIC Investment stock, and 150 shares of Merck stock.

¶ 15    On May 26, 1998, $74,850 was wired into the Baird account. Art originally did not know how the funds were wired into the account. At trial, Art testified that the funds came from a life insurance policy from his father following his passing on December 3, 1997, although he could not produce any documentary evidence to support that assertion. Prior to trial, Art failed to list a life insurance policy from his father on any of his financial statements or requests from Heidi for disclosure of his non-marital property. Art had earlier stated that he did not receive an inheritance from his father. Denis McGauran, Art's financial advisor, testified that he could not identify the source of the $74,850.

¶ 16    On August 3, 1998, Art transferred 17,472 shares of FCNBD to the Baird account. The Baird account also purchased 8,000 shares of FCNBD stock. The Baird account shows that Art purchased 4,000 shares of Bank One stock. An additional 8,000 shares of FCNBD and 4,000 shares of Bank One stock were purchased on margin. The August 1998 Baird account statement showed that it held 25,472 shares of FCNBD stock, and that Art owed $850,071 on his margin account. As to what happened to the remaining 32,168 shares of FCNBD stock after transferring 17,472 shares into the Baird account, Art's counsel averred at trial that "[i]t is likely that the remaining shares were kept in [his] vault or pledged to secure his outstanding loans which at the time were $1,006,146."

¶ 17    Bank One and FCNBD merged in 1998 and on October 7, 1998, Art's Baird account showed that the 25,472 shares of FCNBD stock were converted to 41,264 shares of Bank One

stock, a 1.62-for-1 exchange. On February 25, 2000, Art deposited an additional 52,112 shares of Bank One stock into the Baird account. Art testified that the 52,112 additional shares represented his remaining 32,168 shares of FCNBD multiplied by the 1.62-to-1 exchange rate for each Bank One share. On July 31, 2002, the Baird account held 91,890 shares of Bank One stock.

¶ 18    Art's financial advisor, Denis McGauran, moved from Baird to Raymond James in 2002. In August 2002, Art transferred his Baird account holdings to Raymond James account x7178. The Raymond James account x7178 had total assets valued at $3,852,393.94, including the 91,890 shares of Bank One stock with a value of $3,762,895.50. The Raymond James account x7178 had a margin account that Art used to make additional stock purchases.

¶ 19    Bank One merged with JP Morgan Chase on July 1, 2004, and Art's Bank One shares were exchanged for 110,734 shares of JP Morgan Chase stock. Art deposited the 110,734 shares into the Raymond James account x7178.

¶ 20                                    Tracing of Wintrust stock shares

¶ 21    On December 31, 1992, Art sold 4,108 shares of NDB stock for $132,619. On June 1, 1993, Art purchased 5,000 shares of Northview stock for $250,000. Art was both a founder and board member of Northview Financial Corporation, granting him additional shares in Northview stock. Art had earlier stated that the $250,000 came from margin stock. He later admitted that he did not have a margin account until opening his Baird account in 1997. In his trial testimony, Art stated that he sold the 4,108 NBD shares for $132,619 and borrowed $117,381 in funds from the Bank of Northfield to acquire the 5,000 Northview shares. Art's October 16, 1993, financial affidavit showed 5,000 shares in Northview Bank for $250,000. The affidavit also showed that Bess Investments had an outstanding 1993 loan with Northfield Bank for $309,022. However, no

documentary evidence was introduced to show how much, if any, of the $309,022 loan was used to pay $117,381 for the Northview shares.

¶ 22    Art purchased 1,835 shares of Northfield Financial Corporation stock on January 16, 1995. Art averred that he used non-marital funds to make this purchase through an October 16, 1996, financial statement showing that he had a home equity loan with a $34,656 balance. On July 10, 1997, Art purchased an additional 1,205 shares of Northfield Financial Corporation stock and testified that he funded the purchase with a May 20, 1997, liquidation of a Bess Capital CD for $30,403.38. In addition to the CD, Art testified that he had to borrow $78,000 on a home equity loan to secure the 1,205 shares. Art's July 9, 1997, financial statement showed a home equity loan from Northfield Bank and Trust with an origin date of 1996 and a balance of $115,000.

¶ 23    Art testified that he borrowed $800,000 from LaSalle Bank to loan to Northview Financial Corporation because Northview Bank's capital-to-asset ratio fell below the prescribed percentage as determined by bank regulators. Northview Bank was required to raise capital and, because Art was a director, he agreed to make the loan in exchange for a 9.95% subordinated note for $800,000, due to Art by August 31, 2007. He was also issued a warrant to purchase 2,000 shares of Northview Financial Corporation. On September 6, 2003, Art purchased 2,000 shares of Northview Bank stock with a check issued from his Raymond James x7178 account to Northview Financial Corporation in the amount of $230,000.

¶ 24    Northview Bank merged with Wintrust in 2004. As a result, Art received 28,572 Wintrust stock shares in exchange for 10,040 shares of Northview Bank stock shares, a 2.685-for-1 exchange rate. On October 26, 2004, Art deposited the 28,572 shares of Wintrust stock into the Raymond James x7178 account. After selling 17,000 shares of Wintrust stock in five transactions

between 2004 and 2016, 11,572 shares of Wintrust shares remained in the Raymond James x7178 account as of September 2020.

¶ 25    The trial court ultimately found that Art failed to show by clear and convincing evidence that the JP Morgan and Wintrust stock shares were his non-marital property.

<u>Trial court found that Raymond James x7178 account was marital.</u>

¶ 26    The trial court made the following findings as to the martial classification of the Raymond James x7178 account:

> "The Court finds that Arthur has failed to show by clear and convincing evidence that the Raymond James investment account which contains the stock at issue is non-marital. To better illustrate its reasoning, the Court will use an analogy. A pot of chicken noodle soup is a combination of liquid, protein, vegetables, noodles, and seasoning. After the soup is made, there is no way to deconstruct it. Although one can extract the individual ingredients from the soup, the remaining broth has been forever altered by those ingredients. And indeed, the ingredients used to make the soup have also absorbed the seasoning and the broth, thereby altering them as well. Simply put, it is not possible to restore the individual components of the dish after the ingredients have been transformed into a new dish.
>
> In similar fashion, once Arthur deposited the various stock into his Baird account and later his Raymond James account, there is no way for the Court to deconstruct the investments to isolate Arthur's original non-marital contribution. Once the $74,850 was wired into the Baird account, those funds were used to purchase stock. The Court has found that Arthur failed to meet his burden that the $74,850 was non-marital.

For over 23 years, those $74,850 in marital funds have been used to buy more stock and to act as collateral on the margin account. Arthur used the margin account to purchase more Bank One stock (which was later acquired by JP Morgan). There is no way for the Court to distinguish between the Bank One stock which Arthur purchased on margin from the Bank One stock that may have originated from the Charter Bank stock. Likewise, the shares of Bank One which Arthur inherited from his mother which he kept isolated for many years and then transferred into Raymond James account have become hopelessly commingled with all of the funds and stocks in the Raymond James account. The Court has found that the Northfield stock is marital. The Northfield stock is also deposited into the Raymond James account and those stocks and dividends have become commingled with the Charter Bank Stock and the Bank One stocks Arthur inherited from his mother.

Although Arthur argues that everything in the Raymond James account is non-marital, it is simply not possible for this Court to deconstruct the account. Looking at the account today, Arthur argues that 70% arises from the JP Morgan stock, and that 10% arises from the Wintrust stock. Those percentages are meaningless because it is impossible to "unsalt" the broth. Looking at the account today, the Court has no way of knowing what percentage of stock, if any, is related to the original shares of Charter Bank. Arthur has purchased shares NBD and Bank One and JP Morgan. Arthur has sold shares. Arthur has used all of the stock in his account as leverage to purchase more stock. The fact that 70% of the account arises from JP Morgan stock is not evidence that 70% of the account is non-marital; rather, it is evidence that Arthur chose to buy JP Morgan stock, because it was doing well in the market. The stocks and funds in the Raymond James account have become

hopelessly comingled, thereby divesting Arthur of the ability to trace any theoretical non-martial portion. [Citation]."

¶ 27                                                    **ABCC**

¶ 28    In 1979, Art formed Bess Investments with his father to hold their jointly acquired assets. Art owned 70% of Bess Investments while his father owned 30%. Bess Investments purchased 1850 Glenview Road in Glenview in 1982 via mortgage for $500,000 and was subsequently placed in a land trust to which Art and his father were beneficiaries. The building was used as the second Bess Hardware location. Bess Investments paid the mortgage with rents from Bess Hardware.

¶ 29    In 1995, Art's father transferred to Art his 30% share of Bess Investments. Art subsequently changed the name from Bess Investments to Bess Capital Corp. The assets of Bess Investments were transferred to Bess Capital Corp. Then, in 1996, Bess Capital Corp purchased 1875 Willow Road in Northfield (the original Bess Hardware location) for $1,150,000 funded by a $900,000 mortgage from Northview Bank and Trust, $10,000 in earnest money from Bess Capital Corp, and $206,109.20 in cash. The $206,109.20 was supplied by a certified deposit owned by Bess Hardware for $172,574.53, and a gift from Art's father of $47,000. In 2000, Art changed the name from Bess Capital Corp to Art Bess Capital Corporation (ABCC).

¶ 30    The trial court found ABCC, as well as the properties acquired by it, to be Art's non-marital property. At the time of the dissolution judgment, 1875 Willow Road had a value of 2,400,000.

¶ 31                                                  **Casa Bonita**

¶ 32    ABCC acquired Casa Bonita in 2017 as part of an exchange under section 1031 of the Internal Revenue Code for a purchase price of $2,626,646.24. ABCC exchanged 1850 Glenview Avenue and received $2,091,284.16. Art paid an additional $535,362 in cash to secure Casa Bonita.

¶ 33    In addition to the Raymond James x7178 account, Art opened a Raymond James Stock Account U990 on January 19, 2017. He transferred to that account 12,000 shares of JP Morgan stock valued at $1,015,560 from the Raymond James x7178 account. Because the trial court found the JP Morgan stock and Raymond James x7178 account to be martial, it likewise found Raymond James Stock Account U990 to be marital.

¶ 34    To obtain the $535,362 in cash to complete the Casa Bonita acquisition, Art transferred $100,000 in earnest money from the Raymond James x7178 account. He borrowed the remaining $435,362 from MB Financial by using Raymond James Stock Account U990 as collateral. Arthur ultimately settled the loan with MB Financial with a $551,567 check drawn from the margin line on the Raymond James x7178 account.

¶ 35    The trial court found that Casa Bonita was Art's non-marital property as its original judgment deemed it to be part of the business properties held by ABCC.

¶ 36                                    **BLP**

¶ 37    Following the death of his mother in 2001, Art and his sister inherited an interest in property located at 1915 E. Circle Drive, Northfield, valued at $205,000. Art and his sister formed E Circle LLC to take title to the Circle Drive property. They each owned a 50% share before Art's sister died in 2012. Art bought his sister's share of E Circle LLC for $189,000, paid through a loan Art took from American Charter Bank. To secure the loan, Art used stock in the Raymond James x7178 account as collateral.

¶ 38    In August 2017, Art sold 1915 E. Circle Drive for $725,000. The sale proceeds netted E Circle LLC $502,452 which Art deposited into the LLC's bank account after settling the loan with American Charter Bank.

¶ 39     Using funds from the E Circle Drive LLC, Art purchased 14910 Bayshore Drive, Madeira Beach, Florida, for $780,000. The purchase was accomplished though a wire transfer of $30,000 from the E Circle LLC bank account on November 21, 2017, and an additional wire transfer of $620,000 from the E Circle LLC bank account on December 15, 2017. Sometime prior to the December 15, 2017, transfer, Art borrowed $170,000 from a loan ending in 0686, the collateral for which was the Raymond James x7178 account. The purchase was completed on December 18, 2017, and Art concurrently entered an agreement with two other individuals to develop the property and build additional homes on the site. The joint venture was called Beach Life Properties LLC. Following the withdrawal from BLP by one of the individuals, Art had a 50% interest in BLP.

¶ 40     The trial court found Art's interest in BLP to be his non-marital property, in relevant part, as follows:

> "Although Arthur collateralized the *** loan from American Chartered Bank with stock from the Raymond James [x7178] account, he kept the proceeds from the sale of E. Circle Drive separate from the marital accounts. Once he sold the property, he paid off the loan with proceeds from the sale. Although the Raymond James [x7178] account provided Arthur with the collateral to obtain the loan, no funds were withdrawn from the Raymond James [x7178] account and once he paid the loan from the proceeds of the sale, the collateral was released."

¶ 41     The trial court ultimately allocated 52% of the marital estate to Heidi and 48% to Art. The trial court considered the factors set forth in section 504 of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) and determined that maintenance would not be appropriate for Heidi. The trial court held that the division of marital property and the income the property would

generate was sufficient to permit Heidi to support herself in a manner commensurate with the lifestyle of the marriage.

¶ 42                                   **Post-judgment motions for reconsideration**

¶ 43     Art's motion for reconsideration of the dissolution judgment argued that the trial court erred in finding that the Raymond James x7178 account was marital property. He argued that the individual securities held within the account were distinct and identifiable. He presented the trial court "lot" charts in attempt to further separate and identify the individual stocks held in the Raymond James x7178 account for tracing. The "lot" charts were not introduced during trial. In denying Art's motion, the trial court reiterated that the Raymond James x7178 account had been "commingled to the point of transmutation."

¶ 44     Heidi's motion to reconsider the dissolution judgments was granted, in part. The trial court found that it erred in classifying Casa Bonita as non-marital property, finding as follows:

> "Since Casa Bonita was purchased during the marriage and because Arthur used marital funds from the Raymond James Account to help purchase Casa Bonita, the Court should have classified the property as marital. However, as set forth in the judgment, Arthur can trace his non-marital funds which he used to purchase Casa Bonita as part of the exchange by clear and convincing evidence. Therefore, Arthur is entitled to reimbursement of non-marital contribution in the amount of $2,091,284. The parties stipulated that Casa Bonita has a value of $2,950,000. After subtracting Arthur's reimbursement, the value of the marital portion of the home is $858,716.00. This reclassification of property reduces the value of Arthur's non-marital estate and increases the value of the marital estate."

¶ 45    Heidi further argued in her motion that the trial court erred in its classification of Art's 50% interest in BLP as his non-marital property. The trial court agreed that it misapplied the law, finding as follows:

"[T]he Court misapplied the law when it discounted the fact that Arthur used the Raymond James [x7178] account as collateral for the loan from American Chartered Bank to purchase his sister's interest in the E-Circle property. *** [B]ecause Arthur pledged marital property as collateral for the loan he used to acquire his sister's interest in the E Circle property, the E Circle property was also marital property. When Arthur sold the E Circle property and he placed the proceeds into the E Circle bank account, half of the proceeds from the sale of the home were marital.

Additionally, the Court made a factual error when it concluded that the record did not identify the collateral Arthur used to secure the loan for the Madeira Beach property. In fact, Arthur testified that he used the Raymond James [x7178] account, which the Court has found is marital ***.

Thus, because Arthur used marital funds from the E Circle account to purchase 14910 Bayshore Dr. Madeira Beach, Florida and because he used marital funds to secure a loan in the amount of $170,000 which *** he applied to the purchase of 14910 Bayshore Drive, therefore, 14910 Bayshore is marital property.

The Court erred when it found that [BLP] was Arthur's non-marital property because the business was formed during the marriage and because Arthur used marital funds to purchase 14910 Bayshore Dr. It follows, then, when Arthur entered into an agreement to develop the 14910 Bayshore property, that agreement involved marital property and, therefore, Arthur's one-half interest in [BLP] is also marital."

¶ 46    Following the trial court's ruling on the motions to reconsider, Art's non-marital estate was valued at $5,085.075.90 (after reimbursement of $2,091,284.00 from the marital estate). The marital estate was valued at $12,027,872; Heidi assigned marital property totaling $6,561,823.07; Art assigned marital property totaling $6,058,733.54.

¶ 47    Art filed this timely appeal and Heidi filed a cross-appeal.

¶ 48                                II. ANALYSIS

¶ 49    In this appeal, Art contends that the trial court erred in classifying the Raymond James x7178 account and its contents as marital property. Arthur argues that the trial court's erroneous finding created a "domino effect" on the classification of Casa Bonita and BLP. In Heidi's cross-appeal, she contends that the trial court erred in classifying ABCC and 1875 Willow Road, Northfield, as Art's non-marital property. Heidi argues that both properties were acquired during the marriage and that Art failed to trace the funds used for their acquisition to a non-martial source.

¶ 50    Both appeals concern the trial court's classification of marital and non-martial property as required by section 503(b)(1) of the IMDMA. See 750 ILCS 5/503(b)(1) (West 2020). All property of the parties to a marriage belongs to either the husband's estate, the wife's estate, or the marital estate. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 68. The trial court must classify all property as either marital or nonmarital before dividing the property between the parties. 750 ILCS 5/503(a) (West 2020). We will not disturb a trial court's classification of property unless it is against the manifest weight of the evidence. *In re Marriage of Lundahl*, 396 Ill. App. 3d 495, 504-05 (2009). A trial court's finding is against the manifest weight of the evidence where it is clearly apparent from the record that the trial court should have reached the opposite conclusion or where the finding is arbitrary, unreasonable, or not based on the evidence. *In re Marriage of Dhillon*, 2014 IL App (3d) 130653, ¶ 29.

¶ 51                                    **Art's Appeal**

¶ 52    We begin with Art's argument that the trial court erred in finding that the May 26, 1997, $74,850 deposit into the Baird account came from a marital source. Art maintains that the $74,850 was derived from a life insurance policy on his father's life, for which Bess Hardware paid the premiums, and he and Bess Hardware were the beneficiaries. He argues that the trial court's credibility determination as to his testimony at trial regarding the life insurance policy was "faulty" because (1) it was reasonable for Art to experience lapses of memory about the source of the funds when more than 20 years had passed since the event; (2) he was not served interrogatories that would have resulted in the disclosure of the life insurance proceeds; and (3) his interest in the life insurance proceeds would not be properly included on his financial statements in 1998 as they were then expectancies that had not yet vested.

¶ 53    The trial court's factual findings, including its credibility determination as to Art's testimony at trial regarding the $74,850 deposit, will not be disturbed contrary to the manifest weight of the evidence. *In re Marriage of Sturm*, 2012 IL App (4th) 110559, ¶ 3. We will not reweigh the evidence or assess witness credibility and set aside the trial court's decision simply because a different conclusion may have been drawn from the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 51.

¶ 54    The $74,850 deposit into the Baird account was made in 1997, during the marriage, thus, presumptively marital property. See 750 ILCS 5/503(b)(1) (West 2020). Other than his testimony at trial, Art provided no evidence supporting the proposition that the $74,850 deposit came from his father's life insurance policy. Denis McGauran, who managed the Baird account to which the funds were initially deposited, could not testify as to the source of the $74,850. The only mention on "life insurance" in the record, outside of Art's trial testimony, appear in an October 16, 1993,

financial affidavit listing a $79,812 cash value of "life insurance." Art's father did not pass away until 1997. In any event, the "life insurance" from the October 16, 1993, financial affidavit never appears again in any of Art's subsequent financial statements. When asked at trial whether he had any documents to verify his father's life insurance policy, Art testified "you know, I don't recall, I might have a canceled policy somewhere. I don't know. Or a paid policy. I don't know." The policy was never produced or introduced into evidence.

¶ 55    The record further illustrates that Art was served interrogatories by Heidi. Specifically, interrogatory 22 asked Art to identify each item of non-martial property and the basis for that claim. $74,850 from his father's life insurance proceeds does not appear in his response. While we agree with Art that it was reasonable for him to experience lapses of memory about the source of the funds when more than 20 years had passed since the event, it remained his burden to show that the $74,850 deposit was non-marital by clear and convincing evidence. His mere assertion of such does not overcome that burden.

¶ 56    Art next argues that the $74,850 deposit was used to purchase Compaq Computer shares in September 1999 that became part of the Baird margin account. At that time, Art maintains, the total value of the collateral held in the margin account was $1,592,337 while the value of the Compaq stock was $16,584 or approximately 1% of the total used to collateralize stock purchases. Art avers that the trial court erred by disregarding the intent of section 503(c) of the IMDMA by finding that a *de minimis* amount of marital property transmuted the property held in the account.

¶ 57    Much of Art's argument as to the *de minimis* nature of the $74,850 deposit relies on this court's acceptance and understanding of the "lot" charts he attached to his brief in the supplemental appendix, none of which was introduced at trial. Art did not introduce these charts until attaching them as demonstrative exhibits in his motion to reconsider. Heidi maintains that the introduction

of these "lot" charts was improper in the underlying case and in this appeal. We agree. Trial was held over nine days and consisted almost exclusively around the issues Art has raised in this appeal. Courts should not allow a litigant to stand mute, lose a motion, and then frantically gather evidentiary material to show that the court erred in its ruling. *Wilfong v. L.J. Dodd Construction*, 401 Ill. App 3d. 1044, 1063 (2010). Art asks this court to deconstruct the trial court's thorough and wholly reasonable findings as to the classification of the Raymond James x7178 account, and the securities held therein, by supplying 8,000 pages of exhibits detailing financial transactions going back over 35 years, with some citations to the transactions' locations in the record and some without. This is a burdensome task to put it mildly, but our search of the record reveals that the trial court's findings were not against the manifest weight of the evidence.

¶ 58     Section 503(c) of the IMDMA provides as follows:

"(c) Commingled marital and non-marital property shall be treated in the following manner, unless otherwise agreed by the spouses:

\*\*\*

[1](B) If marital and non-marital property are commingled into newly acquired property resulting in a loss of identity of the contributing estates, the commingled property shall be deemed transmuted to marital property, subject to the provisions of paragraph (2) of this subsection (c).

(2)(A) When one estate of property makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation. No such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence or that was a gift. The court may provide for reimbursement out of the marital property to be divided or by

imposing a lien against the non-marital property that received the contribution." 750 ILCS 5/503(c), (c)(1)(B), (c)(1)(B)(2)(A) (West 2020).

¶ 59    Art's contention that the trial court erred in its application of section 503(c) is misguided. The trial court did not only find that the $74,850 deposit in 1998 was marital, but it also found that Art failed to prove by clear and convincing evidence that the JP Morgan stock and Wintrust stock were his non-marital property and the record supports that finding.

¶ 60    As to the JP Morgan shares, Art testified that he did not purchase any FCNBD stock between 1995 and 1997; he offered only testamentary evidence. No copies of stock certificates were offered into evidence. Between 1995 and 1997, Art's shares of FCNBD stock grew, but there was no evidence offered to determine whether he purchased more stock during that time frame or whether the stocks split or any other explanation for the gains. No evidence was introduced to show that Art did not use marital funds to purchase additional FCNBD shares to overcome the presumption of their marital identity due to their acquisition during the marriage. When Art deposited the stock into the Baird account in 1998, he only deposited a portion of the stock because, he maintains, he left the remaining stock in his safe and later turned the stock into his Baird account. After opening the Baird account, Art purchased additional shares of stock with the marital $74,850.00 which was wired into the Baird account. Mr. McGauran testified Art used those funds to purchase stock. Art testified he purchased stock on margin.

¶ 61    Art argues that the trial court should have taken judicial notice of public knowledge regarding stocks that could be authenticated by newspaper publications in the public domain, and then use its deductive reasoning to confirm the events. See *In re Marriage of Aschwanden*, 76 Ill. App. 3d 680 (1979). His motion to reconsider attempted to introduce a series of links to newspaper articles that allegedly assist in tracing the origins of certain stocks to a non-marital source. While

the trial court may take judicial notice of the price of a publicly traded stock if properly presented at trial, a newspaper article regarding the purported split of the stock of a private corporation does not meet the criteria for judicial notice as it is subject to dispute and not capable of ready determination to "a source whose accuracy cannot reasonably by questioned." IL. R. Evid. 201(b) (eff. Jan. 1, 2011).

¶ 62    Like the trial court, this court cannot determine what portion of the marital stock in the account may have been used as collateral to purchase the additional shares of Bank One and JP Morgan stock. There was no clear and convincing evidence as to what percentage of that stock came from Art's non-marital Charter Bank stock which he purchased prior to the marriage and what portion came from martial funds. For those reasons alone, the trial court's finding that the JP Morgan shares were marital property was not against the manifest weight of the evidence.

¶ 63    Regarding the Wintrust shares, Art did not prove that he used non-marital funds to purchase the 5,000 shares of Northfield Bank in 1993. Art testified that he may have received shares as compensation for sitting on the Northfield Bank Board while married to Heidi. The Northfield shares given to him as repayment for his time as a board member would be marital. Art's testimony that he used funds from a home equity loan to purchase stock was not supported by documentary evidence to show how those funds were used. When Northview merged with Wintrust in 2004, the shares deposited into the Raymond James x7178 account were presumptively marital. Thus, the trial court's findings to that effect were not against the manifest weight of the evidence.

¶ 64    Art is correct in his assertion the Raymond James x7178 account was a mere receptacle to hold funds and securities. See *In re Marriage of Mouschovias*, 359 Ill. App. 3d 348, 354-55. However, that assertion ignores the fact that the trial court's findings with the dissolution judgment and motion to reconsider painstakingly examined the identity of the assets held in the account. Its

findings that the funds in the Raymond James x7178 account had been commingled to the point of transmutation, the trial court stated as follows:

"The May 1, Baird statement shows the wire transfer of $74,850.47. The Court found that Arthur failed to show by clear and convincing evidence that the source of the wire was non-marital. Using the case deposit, Arthur purchased stock, including shares of Compaq Computer. The First Chicago NBD stock first appears in the August 1, 1998, Baird account statement as 25,472 shares. The January 1, 1999, statement shows that the margin line includes the Compaq stock. In October of 1998, FCNBD merges with Bank One. The August 1, 1999, statement shows that Arthur purchased 3,500 shares of Bank One stock. At this time, the margin line includes the Compaq stock. Arthur purchased the Bank One stock on margin. When Arthur purchased the Bank One stock in August of 1999 on margin, the marital stock Compaq was used to secure the loan. Because Arthur used marital stock to secure the margin line, and because Arthur used the margin line to purchase the Bank One stock, those shares of Bank One stock are marital. In February of 2000, Arthur buys 700 shares of Bank One stock on margin. At this time, the margin line is secured by the Bank One stock and the Compaq stock. The Bank One stock used to secure the margin line also contains the marital portion purchased in August 1999. The Compaq stock is marital, and it is also used to secure the margin line which Arthur uses to purchase the 700 additional shares of Bank One stock. Thus, the newly purchased 700 shares of Bank One stock are marital. Arthur continues to sell stock and buy stock on margin, as thus, as the Court works [its] way through the Baird and Raymond James account, the marital and non-marital portions become increasingly tangled. There is transmutation because the stock cannot retain its identity as non-marital. Or, to put it another way, although the stock may

- 21 -

retain its unique identifiers, those identifiers do not include whether the stock was purchased with marital funds. Here, the burden is on Arthur to show by clear and convincing evidence that the shares are non-marital."

¶ 65    The record supports the trial court's findings above, Art's largely testamentary assertions to the contrary notwithstanding. Without clear and convincing evidence that the Raymond James x7178 account and its securities were non-marital, which Art's brief fails to provide, we must hold that the trial court's findings were not against the manifest weight of the evidence. Any non-marital identity that the securities held in the Raymond James x7178 account may have had were commingled into the presumptively marital property acquired throughout the duration of the marriage, resulting in a loss of identity of the non-marital estate. See 750 ILCS 5/503(c) (West 2020).

¶ 66    Having found no error with the trial court's classification of the Raymond James x7178 account as marital property, we need not reach Art's final contention that the trial court's alleged "error regarding the classification of Raymond James x7178 had a domino effect on the classification of other non-marital interests that Art owned outside of the JP Morgan stock, namely, the Wintrust stock, Casa Bonita and BLP and the associated Madeira Beach Property." Because Art pledged and/or used marital property as collateral and/or funds to acquire the Wintrust stock, Casa Bonita and BLP and the associated Madeira Beach Property were properly classified as marital property. See *In re Marriage of Dann*, 2012 IL App (2d) 100343, ¶ 95. Additionally, Art's brief's argument as to this "domino effect" cites no authority or locations in the record to support his claims. Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing. IL. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 67                              **Heidi's Cross-Appeal**

¶ 68    In her cross appeal, Heidi contends that the trial court erred classifying ABCC and 1875 Willow Road, Northfield as his non-marital property. Further, she contends that the trial court erred in classifying certain real estate acquired during the marriage as Art's non-marital property. We continue to apply a manifest weight of the evidence standard of review to the trial court's classification of property. See *supra* ¶ 51.

¶ 69    Heidi argues that Art failed to trace the acquisition of ABCC by clear and convincing evidence to a non-marital source. The evidence in the record belies this assertion. The evidence showed that Art and his father established Bess Investments as a general partnership in 1982, prior to the marriage. The purpose of Bess Investments was to hold property and assets acquired by the partnership. Art obtained his father's share of Bess Investments in 1995 and became its sole owner. He changed the name to Bess Capital Corp in November 1995, as well as changed its identity from a partnership to a corporation. The assets held by Bess Investments were transferred to Bess Capital. In 2000, Art changed its name from Bess Capital Corp to Art Bess Capital Corporation.

¶ 70    "Assets exchanged for separate, non-marital property remain separate property regardless of the number or type of post-marital exchanges, absent an intent to transmute." *In re Marriage of Jelinek*, 244 Ill. App. 3d 496, 506 (1993). The evidence did not show, nor does Heidi assert, that there was any intent by Art to transmute Bess Investments to marital property. All the record and evidence introduced showed was that Art changed the name of the investment company twice after its formation. That mere fact does not automatically transmute ABCC into marital property. See *In re Marriage of Siddens*, 225 Ill. App. 3d 496 (1992). The trial court's finding that ABCC was Art's non-marital property was not against the manifest weight of the evidence.

¶ 71    Heidi next argues that *In re Perlmutter*, (225 Ill. App. 3d. 362 (1992)) supports her contention that 1875 Willow Road, Northfield, is martial because there the reviewing court

determined that real estate and other assets were properly classified as marital where they were acquired during the marriage and not traced to an exception to marital property as found in section 503(a) of the IMDMA. See *Perlmutter*, 225 Ill. App. 3d. at 375.

¶ 72    The facts in *Perlmutter* are inapposite to those presented here. Section 503(a)(6.5) classifies as non-marital "all property acquired by a spouse by the sole use of non-marital property as collateral for a loan that then is used to acquire property during the marriage; to the extent that the marital estate repays any portion of the loan, it shall be considered a contribution from the marital estate to the non-marital estate subject to reimbursement." 750 ILCS 5/503(a)(6.5) (West 2020). Bess Capital Corp acquired 1875 Willow Road with non-marital funds, namely a $900,000 mortgage from Northview Bank and Trust, $10,000 in earnest money from Bess Capital Corp, and $206,109.20 in cash supplied by a certified deposit owned by Bess Hardware for $172,574.53, and a gift from Art's father of $47,000. In addition to the foregoing, the trial court also specifically considered that 1875 Willow Road, Northfield, was purchased by Bess Capital (a non-marital business) for the exclusive use of Bess Hardware (a non-marital business). As 1875 Willow Road, Northfield, was acquired by Art with the use of non-martial property as collateral for the loan, its classification as Art's non-marital property was not against the manifest weight of the evidence.

¶ 73                           III. CONCLUSION

¶ 74    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 75    Affirmed.